AMERICAN BANKERS
ASSOCIATION, Appellant,

v.

SECURITIES AND EXCHANGE
COMMISSION, et al.

No. 85–6055.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 10, 1986.

Decided Nov. 4, 1986.

As Amended Nov. 4 and Nov. 17, 1986.

Michael F. Crotty, with whom John J. Gill, III, Washington, D.C., was on the brief, for appellant.

Paul Gonson, Sol., S.E.C., with whom Linda D. Fienberg, Associate Gen. Counsel, Larry R. Lavoie, Anne E. Chafer, Asst. Gen. Counsels, John E. Birkenheier and Batya Roth, Attys., S.E.C., Washington, D.C., were on the brief, for appellees.

Michael S. Helfer, David M. Becker and Kerry W. Kircher, Washington, D.C., were on the brief, for amici curiae, urging reversal.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This appeal involves the single critical question of whether the Securities and Exchange Commission (SEC) has authority under the Securities Exchange Act of 1934 (1934 Act) to regulate banks as "broker-dealers." After instituting notice and com-

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation · pursuant to 28 U.S.C. § 294(d).

ment rulemaking procedures, the SEC adopted Rule 3b–9 which requires banks engaging in the securities brokerage business for profit to register as broker-dealers under the 1934 Act. *See* Securities Exchange Act Release No. 34–22205, 50 Fed. Reg. 28,385 (July 12, 1985).

In this action, the American Bankers Association (ABA) seeks a declaratory judgment that Rule 3b–9 is invalid under the 1934 Act and an injunction prohibiting the SEC from enforcing the Rule against its member banks. On cross-motions for summary judgment, the United States District Court for the District of Columbia ruled for the defendant and dismissed the ABA's complaint. This appeal followed. Because Rule 3b–9 contravenes the intent of Congress, unambiguously expressed in the language of the 1934 Act, and confirmed in the Act's legislative history, we reverse the decision of the District Court and order it to declare Rule 3b–9 unlawful and to enjoin the Rule's operation against the member banks.

## I. BACKGROUND OF THE SEC'S DECISION TO REGULATE BANKS

The current controversy arises over fifty years after Congress passed the Securities Exchange Act because of a change in the administrative interpretation of the Banking Act of 1933, commonly referred to as the Glass-Steagall Act. Section 16 of the Glass-Steagall Act curtailed the corporate powers of national banks.[1] In relevant part, § 16 provides:

The business of dealing in securities and stock by the [national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [national bank] shall not underwrite any issue of securities or stock: *Provided:* That the [national bank] may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.

12 U.S.C. § 24 (Seventh).[2] Section 21 of the Glass-Steagall Act delineated the general boundary between commercial and investment banking activities:

[I]t shall be unlawful ... for any person, firm, corporation, association, business trust, or similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of receiving deposits subject to check or to repayment upon presentation of a passbook, certificate of deposit, or other evidence of debit, or upon request of the depositor: *Provided,* that the provisions of this paragraph shall not prohibit national banks or State banks or trust companies (whether or not members of the Federal Reserve System) or other financial institutions or private bankers from dealing in, underwriting, purchasing and selling investment securities, or issuing securities, to the extent permitted to national banking associations by the provisions of section 24 of this title....

12 U.S.C. § 378(a)(1).[3]

The Comptroller of the Currency, charged with the duty of regulating the corporate powers of national banks, took the lead in interpreting these provisions of the Glass-Steagall Act for enforcement purposes. In 1936, the Comptroller construed the Glass-Steagall Act to limit brokerage activities by national banks to purchase and sale transactions for "actual customers

---

1. National banks are banks chartered under the laws of the United States. *See* 12 U.S.C. § 21.

2. The original version of § 16 did not include the word "stock," suggesting that national banks could not purchase or sell corporate stock even "without recourse" and "solely upon the order, and for the account of, customers." *See* 48 Stat.

184–85 (1933). In 1935, Congress amended § 16 to correct this omission. *See* 49 Stat. 709 (1935).

3. The original version of § 21 did not contain the proviso at the end. *See* 48 Stat. 189 (1933). The proviso was added by the 1935 clarifying amendments. *See* 49 Stat. 707 (1935).

of the bank, which customer relationship exists independently and apart from the particular transaction in which the bank buys or sells upon the order and for the account of such 'customer.'" 1 Bulletin of the Comptroller of the Currency ¶ 36 (October 26, 1936). The Comptroller also ruled that a national bank "is not authorized to retain any commission, rebate, or discount obtained from others in purchasing for a customer [securities or stock] unless it does not exceed the cost of handling the transaction." *Id.* ¶ 10. The Comptroller justified limiting the charge for brokering a customer's securities or stock on the grounds that the purpose of § 16 of the Glass-Steagall Act was "to prevent national banks from engaging in the brokerage business for profit." *Id.* Thus, under the Comptroller's original interpretation of the Glass-Steagall Act, a national bank could engage in brokerage activities only as "an accommodation agent" for the convenience of existing customers of the bank's traditional banking services. *Id.* ¶ 35. For example, a bank could purchase or sell securities for a trust account that it managed, but it could not make any money on its trades for that account.

This original administrative construction of the Glass-Steagall Act has been dismantled piecemeal over the last fifty years. First, in 1957, the Comptroller repudiated the requirement that national banks receive no profit from the brokerage transactions that they perform for the convenience of their customers. *See* Digest of Opinions of the Comptroller of the Currency ¶ 220A (August 1957 Edition) (quoted in [1973–1978 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 96,272 at 81,357). Nevertheless, at that time, the Comptroller retained the notion that banks could not perform "functions [that] would amount to engaging in the brokerage ... business ... beyond the permissible scope of limited accommodation services." *Id.* Moreover, the Comptroller in 1957 explicitly reiterated its earlier requirement that bank brokerage services

"must be limited to actual customers of the bank—that is, the customer relationship must exist independently of the particular securities transaction." *Id.*

Then, in 1974, the Comptroller interpreted Glass-Steagall to allow banks to offer and advertise computer-assisted stock purchasing services. *See* Comptroller of the Currency Opinion Letter (June 10, 1974), *reprinted in* [1973–1978 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 96,272 at 81,-353. Answering the argument that these services, and in particular, dissemination of advertising about them, controverted the concept of "limited accommodation services," the Comptroller noted that "the 'accommodation' concept is not contained in the statute." *Id.* at 81,360. Because, however, the automatic investment service was limited to customers of the bank's checking accounts, the Comptroller did not explicitly address whether bank could offer and advertise brokerage services for nonbanking customers.

Finally, in 1982, the Comptroller abandoned its interpretation that § 16 of the Glass-Steagall Act limited bank brokerage activities to customers of traditional banking services by allowing a national bank to establish a subsidiary to offer retail discount brokerage services, to banking and nonbanking customers alike, at branch offices of the bank. *See In re Security Pacific National Bank* (August 26, 1982), *reprinted in* [1982–1983 Transfer Binder] Fed. Banking L.Rep. (CCH) ¶ 99,284 at 86,-255.[4] The Comptroller has subsequently made clear that its new interpretation of § 16 applies to the brokerage activities of a bank itself in addition to those of a bank subsidiary. *See, e.g.,* Comptroller of the Currency Opinion Letter No. 363 (May 23, 1986); *see also* 50 Fed.Reg. 31,605 (August 5, 1985) (withdrawing proposed rule which would require national banks engaging in discount brokerage services to do so through a nonbanking subsidiary). Both the Board of Governors of the Federal Re-

---

4. The Comptroller's decision was upheld in *Securities Industry Ass'n v. Board of Governors,* 577 F.Supp. 252 (D.D.C.1983), *aff'd,* 758 F.2d 739 (D.C.Cir.1985) (per curiam), *cert. denied,* —— U.S. ——, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986); *cert. granted on other grounds sub nom. Clarke v. Securities Industries, Ass'n,* —— U.S. ——, 106 S.Ct. 1259, 89 L.Ed.2d 569 (1986).

serve Board and the Federal Deposit Insurance Corporation, acting pursuant to their respective authority to interpret the Glass-Steagall Act, have also recently interpreted §§ 16 and 21 to allow banks to engage in brokerage services for nonbanking customers. *See* Federal Reserve Board's Statement Concerning Applicability of the Glass-Steagall Act to the Commercial Paper Placement Activities of Bankers Trust Company (June 4, 1985);[5] FIDC General Counsel's Opinion No. 6, 48 Fed.Reg. 22,989 (May 23, 1983).

The SEC never attempted to apply its broker-dealer regulations to banks that engaged in profitless accommodation transactions. Nor did the SEC attempt to regulate banks as broker-dealers after either the 1957 or the 1974 revisions in the Comptroller's interpretation. The dramatic surge of banks into the discount brokerage business, resulting from the post–1980 administrative reinterpretations of Glass-Steagall, however, prompted the SEC to subject banks engaging in brokerage business to the same broker-dealer regulation as nonbank brokers.[6]

Thus, in 1985, the SEC issued Rule 3b–9. The Rule regulates as a broker-dealer a bank that either "[p]ublicly solicits broker-age business for which it receives transaction-related compensation" or "receives transaction-related compensation for providing brokerage services for trust, managing agency or other accounts to which the bank provides advice." 17 C.F.R. § 240.-3b–9(a)(1)(2) (1986). The Rule goes on to define "transaction-related compensation" to "mean monetary profit to the bank in excess of cost recovery for providing brokerage execution services." *Id.* § 240.3b–9(d). In other words, the SEC Rule does not reach banks which engage only in the profitless accommodation brokerage service permitted by the Comptroller's original 1936 ruling. But it does cover banks that seek profit from their brokerage business, whether that business was generated from public solicitation or from their existing banking customers.[7]

Rule 3b–9 proceeds on the premise that regulatory authority should be divided among government agencies according to the different financial functions performed by the regulated entity, and not according to the species of financial institution it is (as defined by its charter or even its *primary* function). While this regulatory philosophy enjoys favor in many circles and

**5.** The validity of the Federal Reserve Board's interpretation is currently at issue in Securities Industry Ass'n v. Board of Governors, Nos. 86–5089 et al. (oral argument held April 4, 1986).

**6.** In 1977 (after the Comptroller's 1974 reinterpretation but before the 1980s reinterpretations), the SEC knew of only a single bank that engaged in profit-seeking, nonaccommodation brokerage business comparable to nonbank brokers. *See Reports on Bank Securities Activities of the Securities and Exchange Commission for the Senate Comm. on Banking, Housing, and Urban Affairs,* 95th Cong., 1st Sess. 86, 97–98 (Comm.Print 1977). In contrast, by December 1983 the ABA itself stated that there were as many as 1,000 banks engaging in discount retail brokerage services and that the number was growing rapidly. Administrative Record at 41.

**7.** In addition to requiring banks to register with the SEC as broker-dealers, Rule 3b–9 would subject banks to additional specific regulations. First, under current SEC rules, persons associated with broker-dealers must pass SEC examinations before they can sell securities or become involved in the management of a securities

firm. *See* 50 Fed.Reg. 28,385, 28,387. Second, the 1934 Exchange Act itself imposes on broker-dealers an affirmative duty to adequately supervise its employees in order to prevent violations of federal securities laws. *Id.* at 28,388. Third, the SEC has adopted rules prohibiting broker-dealers from engaging in abusive sales practices, such as "churning" customer accounts in order to increase brokerage commissions. *Id.* at 28,388, 28,390. Fourth, broker-dealers must comply with specific guidelines concerning the content and review of advertisements. *Id.* at 28,388. Fifth, the SEC administers periodic examinations and inspections of broker-dealers as part of its supervisory authority to ensure compliance with the securities laws. *Id.* Sixth, brokers are required by statute to become members of the Securities Investor Protection Corporation, an entity with potentially conflicting authority with the Federal Deposit Insurance Corporation which now regulates banks. *See* Appellant's Brief at 37–38; Administrative Record at 521–22. Finally, the SEC sets capital requirements for broker-dealers, which allegedly could conflict with the capital requirements set for banks by appropriate banking regulators. *See* Appellees' Brief at 61 n. 76.

has received the endorsement of a special task force established to conduct a comprehensive evaluation of federal financial regulation,[8] it is, unfortunately, not the approach taken by the 73rd Congress, which enacted the Securities Exchange Act of 1934. In that Act, as we shall see, Congress explicitly excluded banks from the rules governing brokers and dealers.

■ The District Court recognized that the definitions of "broker," "dealer," and "bank" contained in the 1934 Act, by themselves, unambiguously exclude ABA member banks from SEC broker-dealer regulation. *See* Joint Appendix (J.A.) at 93. Nevertheless, the District Court upheld the validity of Rule 3b–9 because it found two other sources of authority in the same Act for the SEC to redefine these terms to accommodate changing conditions in the banking field. For reasons to be discussed, we find these statutory sections on which the District Court relied inadequate to support the SEC's attempt to amend by regulation the explicit statutory provisions that govern the division of responsibility and jurisdiction between the SEC and banking regulatory agencies. Whatever regulatory coherence Rule 3b–9 would bring to the field of securities brokerage, we conclude the SEC has no authority to regulate banks as broker-dealers, and Rule 3b–9 is invalid.

## II. THE 1934 ACT DEFINITIONS OF "BROKER," "DEALER," AND "BANK"

### A. *The Statutory Language*

Section 3 of the 1934 Act excludes banks from the statutory definitions of "broker" and "dealer." The Act states that "[t]he term 'broker' means any person engaging in the business of effecting transactions in securities for the account of others, *but does not include a bank.*" 15 U.S.C. § 78c(a)(4) (emphasis supplied). Similarly, the statute states that "[t]he term 'dealer' means any person engaged in the business of buying or selling securities for his own account ... *but does not include a bank* ....*" 15 U.S.C. § 78c(a)(5) (emphasis supplied).

In order to subject banks engaging in profit-seeking brokerage business to broker-dealer regulation, the SEC had to draft Rule 3b–9 to redefine the term "bank." It did so by excluding banks engaging in brokerage business for profit from the meaning of "bank" in §§ 3(a)(4) and (5) of the 1934 Act, thus recapturing such banks into the statutory definition of "broker" and "dealer." Thus Rule 3b–9 reads, in relevant part:

> The term "bank" as used in the definition of "broker" and "dealer" in sections 3(a)(4) and (5) of the Act does not include a bank that:
>
> (1) Publicly solicits brokerage business for which it receives transaction-related compensation ...;
>
> (2) Directly or indirectly receives transaction-related compensation for providing brokerage services for trust, managing agency, or other accounts to which the bank provides advice....

17 C.F.R. § 240.3b–9(a)(1)–(2) (1986).[9]

A crucial problem with the SEC's new rule defining "bank," however, is that the 1934 Act already contains a definition of

---

**8.** *See* Blue Print for Reform: Report of the Task Group on Regulation of Financial Services 39–41 (1984) ("The Bush Report") (recommending a "mix of institutional and functional regulatory programs").

**9.** Rule 3b–9 exempts a bank that publicly solicits brokerage business from broker-dealer regulation if the bank itself does not perform the brokerage services but instead contracts with a registered broker-dealer to perform the brokerage services. Similarly, a bank receiving commissions for brokerage services for its trust accounts need not register as a broker-dealer if "the bank executes the transactions through a registered broker-dealer and ... each account independently chooses the broker-dealer through which execution is effected." 17 C.F.R. § 240.3b–9(a)(2)(i) (1986). Rule 3b–9, however, also requires a bank to register with the SEC as a broker-dealer if it "deals in ... securities," *id.* § 240.3b–9(a)(3), even though § 16 of the Glass-Steagall Act provides that a national bank "may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe." 12 U.S.C. § 24 (Seventh). Rule 3b–9 also exempts from SEC broker-dealer regulation a bank that effects each year no more than 1,000 transactions of the type that would

the term "bank." Indeed, the Act's definition of "bank" immediately follows its definitions of "broker" and "dealer."

> The term "bank" means (A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under section 11(k) of the Federal Reserve Act, as amended, and which is supervised and examined by State or Federal authority having supervision over banks and which is not operated for the purpose of evading the provisions of this chapter....

15 U.S.C. § 78c(a)(6). This definition notably does not contain any exception for a bank that "[p]ublicly solicits brokerage business for which it receives transaction-related compensation" or that "directly or indirectly receives transaction-related compensation for providing brokerage service for ... accounts to which the bank provides advice." In sum, the statutory definition of bank contains no exception for banks engaging in brokerage activities for profit;[10] there is no ambiguity or impreci-

sion on this point.[11] As far as the statutory definition of bank is concerned, then, Rule 3b–9 directly conflicts with the language of the 1934 Act.

### B. *Congressional Intent*

The manner in which Congress defined "broker," "dealer," and "bank" in the 1934 Act reflects a purposeful decision on its part that the SEC should not have oversight jurisdiction with respect to banks, because banks were already subject to a complex scheme of administrative regulation at the federal and state level. In the 1934 Act, Congress defined "bank" essentially as an institution subject to at least one of several existing banking regulators: the federal Comptroller of the Currency (for all nationally chartered banks), the Board of Governors of the Federal Reserve System (for all member banks), or any other "State or Federal authority having supervision over banks." Thus, the exemption from SEC broker-dealer regulation is available only to banking institutions regulated by some other government authority.

#### 1. *Evidence of Congress' Intent Not to Impose Additional Government Supervision Upon Banks*

Relevant legislative history confirms that Congress intended to preclude SEC regula-

---

bring the bank within the Rule. *Id.* § 240.3b–9(b)(2).

**10.** Counsel for the SEC stated at oral argument that the clause excluding from the bank exemption institutions that "are operated for the purpose of evading the provisions [of the 1934 Act]" does not apply to ABA members, who are bona fide banks. Transcript of Oral Argument at 29.

**11.** The only imprecise element in the statutory definition of bank is the word "substantial" in the third of the three enumerated means by which an institution can qualify as a bank for the purposes of the Exchange Act, *i.e.,* if it is "a banking institution ... a *substantial* portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks ... and which is supervised by State or Federal authority having supervision over banks." But the content of "substantial" is not at issue in this case. An institution qualifies as a bank under 15 U.S.C. § 78c(a)(6) simply because it has a national charter or because it is a member of the Federal Reserve System; for these institutions

there is no inquiry as to whether a "substantial portion of [their] business" consists of exercising traditional banking functions. Additionally, no claim has been made even for those members of the ABA that must qualify under the third prong, that despite their increased brokerage business, "a substantial portion of [their] business [does not] consist of receiving deposits or exercising fiduciary powers similar to national banks." Only if a state-chartered banking institution that was not a member of the Federal Reserve System were to become so engrossed with the business of brokering securities that receiving deposits or exercising fiduciary powers became an *insubstantial* portion of its business would it fail to qualify as a "bank," and hence meet the statutory definition of "broker" or "dealer," subjecting it to broker-dealer regulation under the 1934 Act. Rule 3b–9, of course, does not purport to turn on the meaning of "substantial," but rather attempts to reach banks which clearly satisfy all three alternatives set forth in the statutory definition of bank.

tion of institutions meeting the statutory definition of "bank" in order to avoid duplicative regulation. The Senate Committee Report accompanying S. 3420 stated that most of the definitions in the bill were "self-explanatory." S.Rep. No. 792, 73d Cong., 2d Sess. 14 (1934). Nevertheless, the Report did comment on the definitions of "broker," and "dealer," definitions the Committee considered to be "the most important ... since many of the provisions of the act apply only to members of exchanges and brokers and dealers who do business through them." *Id.* Expressly recognizing, then, that institutions excluded from the definitions of "broker" and "dealer" would not be subject to many of the Act's important regulatory provisions, the Report unambiguously stated that "banks are expressly exempted from the definitions of 'broker' and 'dealer.'" *Id.* Finally, in summarizing the definition of "bank," the Report highlights its critical essence as including "any ... bank performing normal banking functions, which is subject to supervision and examination by State and Federal authorities." *Id.* The necessary implication of the Senate Report was that any bank already subject to administrative oversight need not be subjected to the new regulatory regime that the bill established for nonbank brokers and dealers.[12]

In 1934, nonbank stockbrokers and securities traders, unlike banks, were not subject to any nationwide, systematic regulation or oversight by federal or state government authorities. The purpose of the 1934 Act was to bring *these* previously unregulated participants in financial markets under a regime of government supervision and examination analogous to that which the Glass-Steagall Act had already mandated for banks.[13] Indeed, one purpose of the 1934 Act's regulation of securities exchanges and broker-dealers was to protect America's banking system.[14] Pre–1929 overextended margin accounts and unwise extensions of credit to brokers by banks had contributed to bank failures: financially precarious banks often could not collect on the loans made to brokers for margin purchases by the brokers' customers.[15] As a result, some of the 1934 Act's most significant provisions regulate margin lending by brokers and control the credit that brokers can receive from banks. *See* 15 U.S.C. §§ 78g, 78h. Because these banking-related provisions implicated the stability of the banking system, the 1934 Act entrusted the Board of Governors of the Federal Reserve System with their administration. Although Congress decided to delegate the supervision and examination of exchanges and broker-dealers to a new agency, there is no indication that in 1934 Congress wanted this new agency,

---

**12.** *See also* H.Rep. No. 1383, 73d Cong., 2d Sess. 17 (language similar to Senate Report).

**13.** *See* 12 U.S.C. § 378(a)(2) (requiring any person or institution "in the business of receiving deposits subject to check or to repayment upon presentation of a passbook" to be subject to regulation and periodic examination by banking regulators).

**14.** Among the reasons for legislation enumerated in § 2 of the Securities Exchange Act, Congress specifically cited the need "to protect and make more effective the national banking system and the Federal Reserve System." 15 U.S.C. § 78b.

**15.** The Senate Report states in detail:

The evidence submitted to the committee by experts on the staff of the Federal Reserve Board has indicated that uncontrolled speculation on security markets was an important cause of the credit inflation which led to the collapse of 1929 and the subsequent depression. Banks diverted their credit from agriculture, commerce and industry to the stock market, where it contributed to the over-expansion of big enterprises, largely engaged in interstate commerce. Corporations took advantage of the abnormal demand for securities by raising new capital, which was not necessary for plant expansion, but which they loaned in the call-money market, thus encouraging further speculation. When the crash finally came, brokers' loans were called, causing greater depreciation in the value of securities, including those held in bank portfolios. This contributed largely to the widespread bank failures, which imperiled the national banking structure....

S.Rep. No. 792, 73d Cong., 2d Sess. 3 (1934).

created for a particular specialization, to regulate the banks.[16]

To the contrary, there is much evidence in the Act's legislative history that Congress decided to exempt banks from the broker-dealer jurisdiction of the SEC because they were already subject to systematic government oversight. The original House and Senate bills did not expressly exclude banks from the definitions of "broker" and "dealer." At the hearings, a prominent New York banker, William Potter, Chairman of the Guaranty Trust Company, complained before the Senate Committee on Banking and Currency that the definitions of "broker" and "dealer," as they then stood, would cover some securities services already being performed by banks:

> [B]anks of this country do not confine their activities solely to banking. . . . A very large proportion of the people of this country turn to their bankers for advice with respect to their investments and the purchase and sale of securities.
>
> Furthermore, banks are called upon constantly to act as the agent of others in the care and custody of securities, the placing of orders for their purchase and sale and in the completion of such transactions, including the receipt or delivery of securities against payment or receipt of the purchase price, and in the safe transmittal of such securities. Many people are utterly unfamiliar with the manner in which such transactions should be carried on . . . and turn to the bankers in recognition of their experience and expertise in such matters. . . .

*Stock Exchange Practices: Hearings Before the Senate Comm. on Banking and Currency, Part 15*, 73d Cong., 1st Sess. 7222 (1934) [hereinafter cited as "Senate Hearings"]. After describing how banks engaged in activities that fit the then defi-

nitions of "broker" and "dealer," Potter went on to advocate that banks should nevertheless not be subjected to the new regulation proposed for nonbank brokers and dealers:

> Permit me to indulge in a further general observation. It seems to me that the regulation of the banks, so far as the National Government is concerned, should be confined to the Comptroller of the Currency, the Federal Reserve Board, and other agencies within the Federal Reserve System. I doubt the wisdom of divided responsibility with respect to such matters, and it seems to me obvious that the banks should not be subjected to the jurisdiction of two arms of the Government whose purposes and policies might at times conflict.

*Id.* Potter then specifically recommended that the bill be amended to exclude banks from the definition of "broker" and "dealer": "I submit that these definitions should be changed, or that some specific statement should be made that banks are not included in such definition." *Id.*

At this point Ferdinand Pecora, the counsel to the Senate Committee and a draftsman of the 1934 Act, interrupted to say that he agreed that the bill should not include banks within the definitions of "broker" and "dealer." *Id.* When the bill was reported out of the Senate Committee, it contained the new clauses excluding banks from the "broker" and "dealer" definitions, as well as a definition of "bank." The House version, ultimately enacted into law, was similarly amended in Committee to exclude banks from the definition of "broker" and "dealer" and to add a definition of "bank." While the House and Senate bills used somewhat different language in defining "bank," both versions were

---

16. Congress considered two alternatives before it decided to create the SEC. One plan was to have all the provisions of the statute administered by the Board of Governors. 78 Cong. Rec. 8162 (1934). The other proposal was that the Board of Governors should administer only those provisions affecting banks and banking, and that the Federal Trade Commission should administer the exchanges and broker-dealers.

*Id.* Congress rejected these alternatives because it did not want existing agencies directly involved with the oversight of exchanges and broker-dealers. Congress wanted a new commission to handle this specialty, but Congress also limited the new commission to this specialty; Congress did not intend the new commission to involve itself with the Federal Reserve System. *See id.* at 8161–63.

identical in defining banks in terms of the government agencies that regulated them.[17]

Since the 1934 Act, Congress has repeatedly exempted banks from the jurisdiction of the SEC, and defined banks in precisely the same way. In 1940, when Congress enacted the Investment Company and Investment Advisers Acts, Congress repeated the same bank exemption from the definitions of "broker" and "dealer," and also from the crucial definitions of "investment company" and "investment adviser" in these Acts. *See* 54 Stat. 791, 792, 798, 848; 15 U.S.C. §§ 80a–2(a)(6), (11), –3(c)(3), 80b–2(a)(3), (7), (11). Moreover, in these Acts Congress again defined banks in terms of the government agencies that regulated them. *See* 54 Stat. 791, 848; 15 U.S.C. §§ 80a–2(a)(5), 80b–2(a)(2). Thus, the definitions in the 1934 Act are but one part of a consistent congressional policy of keeping oversight of the banking system separate from the SEC's oversight of the securities trading and investment industries.

2. *The Special Problem Posed by the Changing Interpretation of the Glass-Steagall Act*

The SEC contends that when Congress exempted banks from SEC broker-dealer regulation in 1934, it was acting under the impression that the Glass-Steagall Act of 1933 precluded banks from brokering securities for a profit or for nonbanking customers. As evidence of this congressional understanding, the SEC points to the testimony of Thomas Corcoran before both the House and Senate Committees that considered the legislation. Corcoran, at the time, was counsel to the Reconstruction Finance Corporation, and an active participant in the drafting of the 1934 Act. Corcoran, too, argued vigorously that the original bill should be amended to exempt banks from broker-dealer regulation. In making his point to the Senate Committee, Corcoran referred extensively to his reading of the Glass-Steagall Act as barring retail brokerage activities by banks:

Of course under the Glass-Steagall bill a bank can no longer peddle securities at retail. It can do two things: it can buy securities for its own account, for its own investment; and it can act as agent to transmit to a broker an order to purchase or sell securities, given to it by one of the bank's customers.

Certainly we had no conception when we drafted the language of this bill that it would be said that if a bank bought securities for its bond account, or merely transmitted, for a service charge, an order from a customer to a broker (because very often customers of banks do not know whom to go to for brokerage service), that operations of that kind on the part of a bank constituted transacting a business in securities.

And I might say that if there is any difficulty with that language, or any conception that it does cover a bank, acting as banks may act under the Glass-Steagall Act, then the language should be changed so that banks so acting are not within the scope of the language....

Senate Hearings, *supra*, at 6470.

Similarly, in his testimony before the House Committee, Corcoran pleaded, "the bill needs to be clarified, so that a bank which just acts for you in passing on an order to a broker ... does not come within that sort of provision," referring specifical-

---

**17.** The Senate and House bills both had identical exemptions for "a banking institution organized under the laws of the United States" and for "a member bank of the Federal Reserve System." The Senate bill additionally included in its definition "a banking institution ... the business of which includes banking and/or the administration of trusts and/or other functions normally performed by banks, which is supervised or examined by State or Federal banking authority, and which does not normally and customarily rehypothecate securities hypothecated with it." S. 3420, 73d Cong., 2d Sess. § 3(a)(6). Insofar as the House version, which did not contain the additional condition concerning hypothecation of securities, was adopted by Congress, the legislative history reinforces the conclusion that Congress did not intend the exemption for banks from the definitions of "broker" and "dealer" to depend in any way on the securities activities of banking institutions under banking regulation.

ly to the bill's restrictions on borrowing by brokers. *Stock Exchange Regulation: Hearings on H.R. 7852 and H.R. 8270 Before the House Comm. on Interstate and Foreign Commerce*, 73d Cong., 2d Sess. 86 (1934). When asked by Representative Edward Kenney why banks should be exempted from these control-of-credit provisions, Corcoran responded: "Because there are plenty of other limitations on the banks. A bank cannot normally go in the business, like a broker, of dealing in securities." When the Congressman interrupted to protest that banks do act like a broker, Corcoran answered, "They are not allowed to do those things any longer, under the Glass-Steagall bill." *Id.* Pressing Corcoran again on exactly what business banks were excluded from, the Congressman was sidestepped: "You may be able to answer that better than I can," said Corcoran. *Id.*

The SEC uses the Corcoran testimony to make the following argument: Congress, in enacting the 1934 Act, adopted Corcoran's understanding that the Glass-Steagall Act precluded banks from engaging in brokerage activities for nonbanking customers. If it turns out that the Glass-Steagall Act in fact does not preclude these activities, then it follows that the SEC must be allowed to advance congressional intent by regulating these new retail brokerage activities of banks. It is not an illogical argument, but it does raise basic issues about the role of courts in construing legislation.

Initially, we emphasize that we do not and need not rule today whether, in fact, the Glass-Steagall Act permits a bank, as opposed to a nonbanking subsidiary of a bank or a bank holding company, to engage in discount brokerage services for members of the general public who do not use the bank's banking services.[18] An argument certainly could be made that a bank can do just that under the reasoning of

*Securities Industry Association v. Comptroller of the Currency*, 577 F.Supp. 252 (D.D.C.1983) (upholding the Comptroller's 1982 decision).[19] In any event, the question whether a bank itself can broker securities for nonbanking customers is squarely presented in a different case before this court, *Securities Industry Association v. Board of Governors*, Nos. 86–5089 et al. (oral argument held April 4, 1986) and we do not predict or rely on any particular outcome in that case to decide this case.

We will assume that Corcoran was incorrect in telling the 1934 Congress that the Glass-Steagall Act precluded banks from acting like other brokers. It still does not necessarily follow that we should attribute Corcoran's erroneous belief to Congress. A court must assure itself of strong evidence of congressional misapprehension before it goes on to decide what Congress would have done, if Congress had known the "truth." Indeed, there is a legitimate question whether a court should ever engage in such surrogate behavior. Here, the conclusion that Congress misinterpreted its own statute, enacted only a year before, in a crucial jurisdictional matter, requires a stronger evidentiary base than the SEC has offered. The end of the exchange between Corcoran and Representative Kenney suggests that Corcoran himself may have been less than totally sure about the effect of Glass-Steagall, since even he ultimately deferred to the legislators' greater familiarity with Glass-Steagall's scope. Corcoran's testimony as a whole may also reasonably be read as an advocate's argument that however Glass-Steagall limits banks, they should be exempted from the definitions of "broker" and "dealer." This interpretation of Corcoran's testimony would line up with the earlier recounted dialogue between Pecora, the Senate Committee counsel, and Potter,

---

18. The Supreme Court has held that a nonbanking subsidiary of a bank holding company may operate a discount brokerage business. *Securities Industry Ass'n v. Board of Governors*, 468 U.S. 207, 104 S.Ct. 3003, 82 L.Ed.2d 158 (1984). The Court, however, expressly left open the question whether a bank itself could engage in discount brokerage activities for nonbanking customers. *Id.* at 219 n. 20, 104 S.Ct. at 3011 n. 20.

19. *See supra* n. 4 and accompanying text.

the New York banker, *see supra,* as further evidence that Congress' primary reason for exempting banks from SEC broker-dealer regulation was that banks were already extensively regulated by other federal and state agencies.

The SEC, however, calls our attention to the fact that Corcoran's interpretation of the Glass-Steagall Act as precluding profit brokerage echoed that of the then Comptroller of the Currency, an official enforcer of the Act. Actually the Comptroller's first official interpretation of the Glass-Steagall Act did not occur until after Congress passed the 1934 Exchange Act.[20] But even if we credit the SEC's argument that it corroborates some common understanding among significant outside participants in the process that the Act limited banks to accommodation brokerage transactions, we are still hesitant to conclude without more direct evidence from congressional sources themselves, *i.e.,* reports or member statements, that Congress itself not only misunderstood the thrust of its own Glass-Steagall offspring, but proceeded to enact further legislation based primarily on that misconception.

Finally, even if we did accept the SEC's assumption that Congress, when enacting the Securities Exchange Act in 1934, acted on an erroneous premise that Glass-Steagall precluded retail bank brokerage activities, SEC's Rule 3b–9 still could not stand. Yet another assumption is essential to its validity: that if Congress had only known how the Comptroller and the courts were going to interpret the Glass-Steagall Act, Congress would not have exempted banks from the SEC's broker-dealer regulation. There is absolutely no evidence in the legislative history supporting (or negating) this

assumption. It is entirely possible— though admittedly speculative—that had Congress anticipated a more liberal interpretation of the Glass-Steagall Act, it would still have decided to leave banks in the hands of bank regulators alone, so as not to subject banks to the double-whammy of additional federal oversight. The contrary prediction may be just as plausible— and just as speculative. It comes down to this: It is not the job of courts to play the game of "what if" in predicting congressional reactions to hypothetical circumstances. Absent an express delegation to the SEC to take account of future changes in banking practices and/or banking regulatory activities, we must give effect to the unambiguous language of the statute itself. *Board of Governors v. Dimension Financial Corporation,* —— U.S. ——, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). Our review of the legislative history of the 1934 Act does reveal some ambiguities in it—but these ambiguities cannot serve to erode the unambiguous language of the Act. There is no clear congressional intent to direct otherwise.

## C. *The 1975 Amendments*

We find in post–1934 events yet another reason to honor the clear statutory language in this case. Whatever Congress' understanding of the Glass-Steagall Act during the passage of the Securities Exchange Act in 1934, forty years later Congress reaffirmed the basic regulatory structure set up in the 1934 Act: banks are to be supervised exclusively by banking regulators and not by the SEC.

In 1975, a year after the then Comptroller of the Currency issued his opinion letter repudiating the accommodation concept,

---

**20.** Because Congress delayed for a year the operation of §§ 16 and 21 of the Glass-Steagall Act, they did not even go into effect until June 16, 1934, ten days after the enactment of the Securities Exchange Act. Thus, the Comptroller had no occasion to officially apply these sections until after Congress passed the 1934 Act. Moreover, during that year, the meaning of §§ 16 and 21 was anything but settled. The Comptroller believed that the language of § 16, as originally enacted, absolutely prohibited

banks from brokering *stocks* even if "without recourse" and only "upon the order, and for the account of, customers." *See, supra,* n. 2. Yet, because he did not believe that Congress intended to reach this result, the Comptroller was urging Congress to amend Glass-Steagall to explicitly allow these bank brokerage activities. *See* Kress, The Banking Act of 1935, 34 Mich.L. Rev. 155, 177–78 (1935) (citing 1933 Annual Report of the Comptroller of the Currency).

Congress enacted a comprehensive set of amendments to the Securities Exchange Act of 1934. The House-passed version contained a provision that directed the SEC "to make a study of the securities activities conducted by persons who are not brokers or dealers ... to determine ... whether the exclusion from the definition of broker and dealer are necessary and appropriate for the protection of investors and to achieve the purposes of this title." H.R. 4111, § 20A(j)(1). The Report of the House Committee on Interstate and Foreign Commerce accompanying H.R. 4111 showed an awareness that the interpretation of the Glass-Steagall Act was changing, and that banks were becoming increasingly involved in brokerage business: "Since 1934, banks have been excluded from the definition of 'broker' and 'dealer' under the Securities Exchange Act. It had been thought that the Glass-Steagall Act had effectively removed banks from the securities business. In recent time, however, banks have undertaken a host of securities related activities." H.R.Rep. No. 123, 94th Cong., 1st Sess. 93 (1975).

The Senate bill did not contain a similar study provision, but the Conference Committee picked up the House provision. The Conference Report, however, tempered the House Report's reference to the original understanding of the Glass-Steagall Act: "These provisions do not authorize the Commission to study or make recommendations with respect to whether these activities are or should remain permissible under the Banking Act of 1933. This matter is the subject of a planned investigation by the Senate Committee on Banking, Housing, and Urban Affairs." H.R.Conf.Rep. No. 229, 94th Cong., 1st Sess. 111 (1975), U.S.Code Cong. & Admin.News 1975, pp. 179, 342. With that caution, and some slight modification in language, the House-originated study provision was enacted into law. Act of June 4, 1975, Pub.L. No. 94–29, 89 Stat. 111.

Thus, both Houses of Congress were aware as late as 1975 that the administrative interpretation of the Glass-Steagall Act was undergoing considerable revision and that new interpretations of the Glass-Steagall Act might well bring banks actively into the retail brokerage business. Congress, moreover, was sufficiently concerned about the implications of this development to direct the SEC study. Nevertheless, Congress did not see fit then or since to amend the 1934 Act's definitions of "broker" and "dealer" to include banks. Furthermore, rather than authorize appropriate rulemaking if, in its expertise, the SEC concluded that banks should be subject to broker-dealer regulation, Congress directed the agency to report back to Congress "with *recommendations for legislation* as it deems advisable." 15 U.S.C. § 78k–1(e) (emphasis supplied).[21]

Thus, in a new statute passed forty years after the Exchange Act, Congress determined not to amend the definitions of "broker," "dealer" or "bank" to authorize the SEC to regulate banks as broker-dealers without further congressional consideration. Especially in light of such recent action (or purposeful inaction), this court cannot now find authority for the SEC to amend the 1934 statutory definitions by administrative regulation, much as we might sympathize with the SEC's motivation for and the public interest in such regulation. That is a move that Congress alone can make. So far it has not chosen to do so.

### D. *Relevant Caselaw*

The SEC cites the Supreme Court's decision in *SEC v. Variable Annuity Life In-*

---

**21.** In its response to Congress' directive, the SEC concluded that the exclusion of banks in the definitions of "broker" and "dealer" should not be eliminated, saying that the imposition of its broker-dealer regulation on banks would result in "duplicative and burdensome regulation." *Reports on Bank Securities Activities of the Securities and Exchange Commission, S.* *Comm. on Banking, Housing and Urban Affairs,* 95th Cong., 1st Sess. 305 (Comm.Print 1977). Instead, to the extent that bank brokerage activities needed additional regulation in order to "assure adequate investor protection," the SEC recommended that Congress require federal banking regulators to promulgate such rules. *Id.* at 305–08.

*surance Co. of America (VALIC)*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), for the proposition that courts need not always feel bound by the literal language of exceptions to definitions in statutes enforced by the SEC. In *VALIC* the issues were whether a variable annuity contract was a "security" within the definition of that term in the Securities Act of 1933 and whether a company offering these variable annuity contracts was an "investment company" within the definition of that term in the Investment Company Act of 1940.

As the Supreme Court stated, the 1933 Act explicitly exempted "insurance" or "annuity" contracts from the definition of "security," and the 1940 Act explicitly exempted an institution which met the definition of "an insurance company" from the definition of "an investment company." Except for the exemptions, the variable annuity contract and the companies that offered them would fall within the 1933 Act definition of "security" and the 1940 Act definition of "investment company."

The Investment Company Act defined an exempted "insurance company" as "a company ... whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies and which is subject to supervision by the insurance commissioner or a similar official or agency of a State...." 15 U.S.C. § 80a–2(a)(17).

The 1933 Securities Act did not actually contain a definition of "insurance" or "annuity contract." The statute merely stated that its provisions "shall not apply to ... any insurance ... or annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State...." 15 U.S.C. § 77c(a)(8).

The SEC points out the similarity between the exemptions in *VALIC* and those in this case; like the 1934 Act exemption for banks, the exemptions for annuities and insurance companies in *VALIC* were structured in terms of existing supervision by other agencies. The Supreme Court in

*VALIC*, however, held that variable annuity contracts and the companies that offered them were not exempt from the statutory definitions of "security" and "investment company" and hence were subject to SEC regulation.

Despite surface similarity, we find crucial distinctions between *VALIC* and this case. The decision in *VALIC* turned on the fact that a variable annuity contract contained markedly distinct features from a traditional fixed-dollar annuity contract. A "recent development" in 1959, a variable annuity paid out in "fluctuating amounts, measured ultimately by the company's success in investing the premium payments received from annuitants." 359 U.S. at 95, 79 S.Ct. at 634 (Harlan, Jr., J., dissenting). Accordingly, the holder of a variable annuity, as opposed to a fixed annuity, "participates on an 'equity' basis in the investment experience of the enterprise," just like the owner of a share of company stock or a mutual fund does. 359 U.S. at 79, 79 S.Ct. at 626 (Brennan, J., concurring). Thus, although a variable annuity contract by name might fit a literal reading of "any insurance ... or annuity contract," the Supreme Court concluded that Congress, in exempting insurance-type contracts from SEC regulation, did not intend to exempt what were essentially equity shares, however labelled:

> [A]bsent some guarantee of fixed income, the variable annuity places all the investment risks on the annuitant, none on the company. The holder gets only a *pro rata* share of what the portfolio of equity interests reflects—which may be a lot, a little, or nothing. We realize that life insurance is an evolving institution.... But we conclude that the concept of "insurance" involves some risk-taking on the part of the company.

359 U.S. at 71, 79 S.Ct. at 621 (footnote omitted). And, since variable annuity contracts were not "insurance" for the purposes of SEC regulation, a company that was organized to offer only variable annuities was not a company "whose primary

and predominant business activity is the writing of insurance."

In contrast, here there is no issue about whether members of the American Bankers Association meet the statutory definition of "bank" in 15 U.S.C. § 78c(a)(6). While it is true that some such institutions are actively brokering securities and stock, the fact remains that a "substantial" portion of the business of these institutions consists of. traditional banking services.[22] This is not then the analogue to *VALIC* where an institution calls itself a bank, but the substantial portion of its business does not consist of traditional banking services.

In *VALIC* the Supreme Court found sufficient imprecision in the statutory term "insurance" to permit it to decide that a variable annuity did not fit that term. The Supreme Court did not conclude that although variable annuities concededly fell within the insurance exemption, sound regulatory policy required SEC oversight of these contracts (and the companies that offered them). Here, on the other hand, there is no question that the 15 U.S.C. § 78c(a)(6) definition of "bank" encompasses ABA members. Therefore, a validation of Rule 3b–9 would require this court to override unambiguous statutory language and to determine, for policy reasons, that SEC should be allowed to impose additional government oversight upon banks that engage in nonaccommodation brokerage activities. If nothing else, the Supreme Court's decision in *Board of Governors v. Dimension Financial, supra*, precludes such a course.

*Dimension Financial* was a case involving institutions whose only "banking" services were offering "negotiable order of withdrawal" or NOW accounts. The Bank Holding Company Act defined "bank" for the purposes of its operative provisions as including any institution "which ... accepts deposits that the depositor has a legal right to withdraw on demand." *See* 106 S.Ct. at 683. Although NOW accounts did not give depositors the legal right to withdraw upon demand, the Board of Governors of the Federal Reserve System considered NOW accounts as the functional equivalent of traditional checking accounts and attempted to regulate institutions which offered them as banks. Therefore, despite the unambiguous statutory language, the Board of Governors issued a regulation that defined "banks" under the Bank Holding Company Act as including "any institution that ... accepts deposits that 'as a matter of practice' are payable on demand." *See id.* In invalidating the Board's regulation, the Supreme Court stated:

> Without doubt there is much to be said for regulating financial institutions that are the functional equivalent of banks. NOW accounts have much in common with traditional payment-on-demand checking accounts; indeed we recognize that they generally serve the same purpose. Rather than defining "bank" as an institution that offers the functional equivalent of banking services, however, Congress defined with specificity certain transactions that constitute banking subject to regulation. The statute may be imperfect, but the Board has no power to correct flaws that it perceives in the statute it is empowered to administer. Its rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute.

*Id.* at 689 (footnote omitted). Here, as in *Dimension Financial*, the 1934 Act may be imperfect in not allowing SEC regulation of banks that engage in discount brokerage activities, but here, as in *Dimension Financial*, the statutory definition of "bank" precludes the agency from issuing a regulation fundamentally altering that imperfect definition.

Thus, *Dimension Financial* and not *VALIC* controls our statutory interpretation in this case. We note as well that, in contrast to the congressional decision in 1975 to leave the bank exclusion intact, in *VALIC* there was no legislative reaffirmation of the exemptions after Congress be-

---

**22.** *See, supra,* n. 11.

came aware of the problem of variable annuities.

## III. THE "CONTEXT CLAUSE" AND THE SEC'S AUTHORITY TO DEFINE THE ACT'S "TERMS"

In upholding the validity of Rule 3b–9, the District Court relied on the clause "unless the context otherwise requires," which precedes all forty definitions contained in 15 U.S.C. § 78c. The District Court held that the existence of this "context" clause rendered the statutory definitions of "broker," "dealer," and "bank" imprecise, thereby triggering judicial deference to a reasonable agency interpretation of these terms under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Court found Rule 3b–9 to represent a reasonable interpretation of "bank" because "the services now promoted by the bank[s] are functionally indistinguishable from those offered by registered brokers," a change from the circumstances in which banks "merely provid[ed] accommodation services to existing customers." J.A. at 97. For the same reasons, the District Court held that the SEC's redefinition of "bank" fell within the delegation that "[t]he Commission and the Board of Governors of the Federal Reserve System, as to matters within their respective jurisdictions, shall have power by rules and regulations to define technical, trade, accounting, and other terms used in this chapter, consistently with the provisions

and purposes of this chapter." 15 U.S.C. § 78c(b). The SEC now argues that we should affirm the judgment of the District Court on one or both of these bases.

### A. *The Context Clause*

First and foremost, we do not accept the major premise of the SEC's context clause argument: that the phrase "unless the context otherwise requires" refers to out-of-Act market or regulatory circumstances as well as in-Act textual contexts. We read the context clause as meaning only that if in the case of a frequently occurring statutory term, its immediate context suggests that a literal application of the statutory definition would produce absurd consequences or run counter to the obvious thrust of the section, the agency may appropriately modify the definition. *See SEC v. National Securities, Inc.,* 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969) ("Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws.").

It is true that the Supreme Court in *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), suggests that the context clause may authorize an agency or court to take account of outside circumstances in construing a term defined in the 1934 Act. That observation was, however, both unnecessary to the Court's holding [23] and proffered only in a passing reference with no explanation or discussion.[24] We are convinced by the more elab-

---

**23.** The issue in *Marine Bank* was whether a bank certificate of deposit was a "security" for the purposes of the 1933 Securities Act. Although the Supreme Court acknowledged that the statutory definition of "security" was sufficiently broad to cover a bank certificate of deposit, the inherent nature and function of the instrument was such that it did not make sense to classify it as a "security" for purposes of the 1933 Act. *Marine Bank* holds only that in order to determine whether a particular financial instrument is a security, one must examine the underlying economic realities. A more recent Supreme Court decision, *Landreth Timber Company v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), also supports reading *Marine Bank* as a case stressing the need to consid-

er the underlying economic realities in charting inherently imprecise contours of the term "security." *See id.* at 2304 & n. 4. Even without a context clause, the Court would have done the same thing and arrived at the same conclusion. Thus, because the 1933 Act definition of "security," unlike the 1934 Act definition of "bank" often requires an independent examination of factual circumstances, it would go too far to infer from *Marine Bank* a general interpretation of the "context" clause allowing some kind of economic realities test for all forty definitions in the Securities Exchange Act.

**24.** The opinion simply stated: "The definition of 'security' in the 1934 Act provides that an instrument which seems to fall within the broad sweep of the Act is not to be considered a

orately reasoned, post-*Marine Bank* decision in *Ruefenacht v. O'Halloran*, 737 F.2d 320 (3d Cir.1984), *aff'd sub. nom. Gould v. Ruefenacht*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), that the context clause does not confer such a broad license upon courts and the SEC to change basic decisions made by Congress. We will not repeat here Judge Gibbons' persuasive opinion in *Ruefenacht*, but only briefly summarize its discussion of the context clause's legislative history to explain why we conclude that "context" refers only to in-Act textual context.

The context clause in the 1934 Act had its origin in an identical clause which preceded all the definitions in the 1933 Securities Act. The Senate and House versions of the 1933 Act contained different versions of this prefatory clause. The House version contained the clause "unless the *context* otherwise required." The Senate version simply read "unless the *text* otherwise indicates." Although the Conference Committee adopted the House version, the Conference Report makes no mention of any difference between these prefatory clauses. The Third Circuit inferred from the absence of any discussion that the distinction between "text" and "context" had no particular significance. We reach the same conclusion that "Congress did not intend the context clause as a font of authority" for the SEC to alter definitions in the 1934 Act "when the underlying facts may seem to warrant." 737 F.2d at 331.

Even if we agreed that the context clause permits more input than is found inside the four walls of the statute, there would remain a serious question about when factual "context" actually "requires" deviation from the statutory definition. Specifically, if Congress exempted banks from SEC broker-dealer regulation to avoid imposing on banks additional government oversight regardless of precisely what bank brokerage activities Glass-Steagall allowed, can it reasonably be said that the relevant "context" has changed simply because banking regulators have now liberal-

ized their interpretations of Glass-Steagall strictures? It sounds farfetched. But it illustrates the point that giving such sail to the context clause would embroil courts in constant controversies as to whether the context that had changed was really relevant at all. According wide deference to agency judgment on the relevance of the context could of course minimize judicial review responsibilities, but it would also revolutionize current rules of statutory construction and doctrines of plain meaning and congressional intent. It is too big a step to take on the basis of a rote phrase embedded in a definitional section of a complex statute.

In closing out this discussion, we stress that even if the context clause on some other occasion might justify interpreting a statutory definition in light of changing market conditions, it cannot carry the weight of Rule 3b–9. Here, the unambiguous language that Congress chose for the statutory definitions of "broker," "dealer," and "bank" (formulations that Congress repeated in the 1940 Investment Company and Investment Advisers Acts) expresses a congressional delineation of the jurisdictional boundaries between the SEC and banking regulators. A universal clause preceding every definition in the statute, which states only "unless the context otherwise requires," cannot provide the authority for one of the agencies whose jurisdictional boundaries are defined in the statute to alter by administrative regulation those very jurisdictional boundaries. To suggest otherwise is to sanction administrative autonomy beyond the control of either Congress or the courts.

## B. *15 U.S.C. § 78c(b)*

Section 78c(b), on which the District Court also relied, gives the SEC authority to define technical, trade, accounting, and other terms only with respect to "matters within [its] jurisdiction [ ]." The whole point of the bank exclusion clauses in the definitions of "broker" and "dealer" is to place banks outside the broker-dealer juris-

security if the context otherwise requires." 455 U.S. at 558–59, 102 S.Ct. 1224–25.

diction of the SEC and leave them to the jurisdiction of banking regulators alone. The SEC cannot use its definitional authority to expand its own jurisdiction and to invade the jurisdiction of other agencies, including the Board of Governors. Such use of § 78c(b) would not be "consistent [ ] with the provisions and purposes of this chapter." *Cf. FAIC Securities, Inc. v. United States,* 768 F.2d 352, 362 (D.C.Cir. 1985) (holding that a similar grant of definitional authority to the FDIC did not allow the agency to expand its jurisdiction by redefining terms already defined by statute).

Indeed, the very language of § 78c(b) reminds us that Congress delegated to the Board of Governors, and not the SEC, the authority to enforce certain provisions of the 1934 Act and so to define terms fully within its enforcement authority. Thus, even if it could be shown that Congress intended to delegate the authority to redefine "bank" so as to bring banks back within the definition of "broker" and "dealer," we would have no statutory basis for deciding which agency Congress chose for this delegation. Contrary to the SEC's assumption that it would be the only logical choice, we think the fact that an institution meets the statutory definition of "bank" simply by being within the jurisdiction of the Federal Reserve System suggests that the Board of Governors might be the more likely candidate. At base, however, we cannot read the 1934 Act as granting either agency the authority to redetermine jurisdictional boundaries laid down in the 1934 Act.[25] Under the law as presently written,

that is a task that Congress has reserved for itself.

CONCLUSION

■ In the end, all of the SEC's efforts to avoid the "plain meaning" of the definitions of "broker," "dealer" and "bank" fail. We give effect to the statutory language not simply because its meaning is as "plain" as can be, but because it reflects a basic decision by Congress on how to allocate responsibility among different federal agencies for regulating financial institutions and markets. Rule 3b–9, whatever its beneficial purpose or the regulatory need for some such authority, still represents an attempt by one federal agency to reallocate, on its own initiative, the regulatory responsibilities Congress has purposefully divided among several different agencies. It is tantamount to one of the regulatory players unilaterally changing the rules of the game. The SEC by itself cannot extend its jurisdiction over institutions expressly entrusted to the oversight of the Comptroller, the Board of Governors, the FDIC, and others.

Given the dramatic changes in the nature of financial institutions and market practices in the last fifty years, Congress might do well to undertake a comprehensive reexamination of the Glass-Steagall Act and the Securities Acts. Indeed, it might well determine from such a reexamination that banks should be allowed to engage in brokerage business like any other broker, but that banks should be regulated by the SEC like any other broker. Until that day, however, the SEC operates under the limited authority of the 1934 Act and must refrain

---

**25.** As part of the 1975 amendments to the 1934 Act, Congress added "other" terms to the list of generic definitions contained in § 78c(b). According to the Senate Report the purpose of this amendment was "to broaden the authority of the Commission and the Board of Governors of the Federal Reserve System to make clear that they may define any term used in the Exchange Act, whether or not it is already defined in the title." S.Rep. No. 94–75, 94th Cong., 1st Sess. 94 (1975), U.S.Code Cong. & Admin.News 1975, 272. This language does not alter our determination that the SEC cannot redefine a statutory term if doing so would encroach on the jurisdic-

tion of the Board of Governors. We note further that the amendment to the SEC's definitional authority appears in the same statute that directed the SEC to make recommendations for *legislation* concerning whether the Exchange Act should be amended to include banks within the definitions of broker and dealer. *See, supra,* Part II.C. It seems highly unlikely that in the same Act, the legislators would direct the SEC to make a *study* of the precise question here and recommend legislation on it, and also authorize the SEC to decide that very same question any way it chose.

from regulating banks as broker-dealers. The judgment of the District Court is *Reversed.*