**Maurice McCREARY, M.D., et al., Appellants,**

v.

**Paul OFFNER, Commissioner of Health Care Finance of the District of Columbia Department of Human Services, and United States of America, Appellees.**

No. 98–5155.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1998.

Decided April 13, 1999.

James A. Barker, Jr. argued the cause for appellants. With him on the briefs was Allen V. Farber.

Alisa B. Klein, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were Frank W. Hunger, Assistant Attorney General, Wilma A. Lewis, U.S. Attorney, and Bar-bara C. Biddle, Attorney, U.S. Department of Justice.

John M. Ferren, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Lutz Alexander Prager, Assistant Deputy Corporation Counsel, were on the brief for appellee Paul Offner.

Before: WALD, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Under Medicaid's "buy-in" program, states must use Medicaid funds to enroll certain needy, Medicare-eligible individuals in Medicare's Part B supplemental insurance program. In this case, we must determine whether the buy-in program requires states to reimburse Medicare providers the entire twenty percent copayment that patients normally pay for a particular service under Part B, or whether, as the United States Department of Health and Human Services has long permitted, states may limit reimbursement to the almost always lower Medicaid rate for the same service. Relying on HHS policy, the District of Columbia began capping copayment reimbursement at Medicaid rates in 1990. Appellants, a group of District of Columbia doctors, challenge the District's policy, arguing that until Congress amended the buy-in statutes in 1997, the law required the District to reimburse them at Medicare rates. Finding the pre–1997 statutes ambiguous as to state copayment reimbursement obligations, and finding HHS's interpretation reasonable, we affirm the district court's grant of summary judgment for the District.

I

Enacted in 1965, Medicare finances medical procedures for people over 65 and people with disabilities. *See* 42 U.S.C. §§ 1395–1395ccc (1994). Medicare has two

parts, Part A and Part B. Part A provides reimbursement for inpatient hospital care and related post-hospital, home health, and hospice care. *See id.* §§ 1395c to 1395i–4. Enrollment in Part A is automatic. Part B is voluntary. It provides supplemental insurance for hospital out-patient services, physician services, and other medical services not covered under Part A. *See id.* §§ 1395j to 1395w–4. Part B imposes cost-sharing obligations on people who choose to participate. These include an annual deductible, monthly premiums, and—of particular relevance to this case— copayments. Copayments consist of twenty percent of the "reasonable charge" for the service rendered, an amount determined annually by HHS. *See id.* § 1395*l*(a). Medicare directly reimburses Part B providers for the remaining eighty percent. *See id.*

Also enacted in 1965, Medicaid, a cooperative federal-state program, finances medical care for the poor, regardless of age. *See* 42 U.S.C. §§ 1396–1396v (1994). Participating states must establish financial eligibility criteria, identify covered medical services, develop rate schedules, and submit their plans to HHS for approval. *See id.* §§ 1396a(a), 1396a(b). HHS approval entitles a state to substantial federal funding, ranging from fifty percent to eighty-three percent of the cost of medical services provided under the plan. *See id.* § 1396d(b). Doctors and other health care providers are not required to service Medicaid patients, but if they do they must accept reimbursement from the state at its Medicaid rate as payment in full; they may not demand additional payment from patients. *See id.* §§ 1320a–7b(d), 1396o. State Medicaid rates for any given service are almost always lower than the "reasonable charge" for the same service under Medicare Part B. Indeed, Medicaid rates are often even lower than the eighty percent of the reasonable charge that the federal government reimburses Medicare providers.

Medicare and Medicaid intersect with respect to the elderly poor—so-called "dual eligibles." While these people are eligible to purchase supplemental medical insurance through Medicare Part B, many cannot afford Part B's premiums, deductibles, and copayments. Medicaid has therefore long allowed states to use Medicaid dollars to enroll dual eligibles in Medicare Part B by paying their cost-sharing obligations. *See* Pub.L. No. 89–97, § 121(a), 79 Stat. 286, 346 (1965) (codified at 42 U.S.C. § 1396a(a)(15)) (repealed 1988). Because the federal government heavily subsidizes Medicaid, this "buy-in" program enables states to shift a large portion of the cost of caring for the elderly poor to the federal treasury.

In 1986, Congress expanded the buy-in program beyond dual eligibles to include a newly created category of "qualified medicare beneficiaries" ("QMBs"): elderly people not quite poor enough to qualify for Medicaid but who nonetheless met certain neediness criteria. *See* Pub.L. No. 99–509, § 9403, 100 Stat. 1874, 2053–55 (1986) (codified at 42 U.S.C. §§ 1396a(a)(10)(E), 1396d(p)(1) (1994)). Initially optional, the QMB buy-in program became mandatory in 1988. *See* Pub.L. No. 100–360, § 301, 102 Stat. 683, 748 (1988) (deleting "at the option of a State" from 42 U.S.C. § 1396a(a)(10)(E)). Also in 1988, Congress redefined the term "QMB" to include dual eligibles. *See* Pub.L. No. 100–485, § 608(d), 102 Stat. 2343, 2416 (1988).

This appeal presents the following issue: Are Medicare providers performing Part B services to QMBs entitled to state reimbursement for the entire twenty percent copayment that a non-QMB Medicare patient would normally pay, or may states limit reimbursement such that providers receive no more than the state's Medicaid rate for the same service? For example, suppose that the reasonable charge for a given Part B service is $100, but a state's Medicaid rate for the same service is only $90. If a Medicare doctor performs that service, the federal government reim-

burses the doctor $80, whether or not the patient is a QMB. If the patient is a QMB, does the buy-in scheme require the state to reimburse the doctor for the patient's entire $20 Medicare Part B copayment? Or may the state give the doctor only $10 so that total reimbursement, including the federal government's $80, equals $90, the Medicaid rate? If the Medicaid rate for the particular service is $70, may the state refuse to reimburse the doctor at all because the $80 provided by the federal government already exceeds the Medicaid rate? *See Paramount Health Sys., Inc. v. Wright,* 138 F.3d 706, 708 (7th Cir.1998) (using this example).

Four statutory provisions added to the buy-in scheme in 1986 frame this issue. Read alone, two suggest that states must use Medicaid funds to reimburse Medicare providers performing Part B services to QMBs for the full twenty percent copayment ($20 in the above example) for which non-QMB Medicare patients would be responsible. Under 42 U.S.C. § 1396a(a)(10)(E)(i), a state Medicaid plan "must" provide for "making medical assistance available for medicare cost-sharing ... for qualified medicare beneficiaries." Section 1396d(p)(3)(D) in turn defines "medicare cost-sharing" to include Medicare premiums, deductibles, and "[t]he difference between the [80 percent of the reasonable charge that the federal government reimburses providers under Part B] and the amount that would be paid ... if any reference to '80 percent' ... were deemed a reference to '100 percent.'" Section 1396a(a)(10)(E)(i)'s mandatory language coupled with section 1396d(p)(3)(D)'s reference to specific percentages suggests that states must use buy-in funds to reimburse providers for the *entire* twenty percent Part B copayment.

The other two provisions enacted in 1986 suggest a different interpretation. Section 1396a(a)(VIII) provides that "medical assistance made available to [QMBs] ... shall be limited to medical assistance for medicare cost-sharing. ..., subject to the provisions of [section 1396a(n)]." Before its amendment in 1997, section 1396a(n), entitled "Payment amounts," in turn provided:

In the case of [Medicaid funds provided] for medicare cost-sharing respecting the furnishing of a service or item to a qualified medicare beneficiary, the State plan *may* provide payment in an amount ... that results in a sum of such payment amount and any amount of payment made [by the federal government under Medicare Part B for] the service or item exceeding the amount that is otherwise payable under the State [Medicaid] plan for the item or service for eligible individuals who are not qualified medicare beneficiaries.

*Id.* § 1396a(n) (amended 1997) (emphasis added). Section 1396a(n)'s use of the word "may" rather than "shall" suggests that states are permitted, not obligated, to reimburse Part B providers above the Medicaid rate—$10 if as in the above example the Medicaid rate were $90, or zero if the Medicaid rate were $80 or less.

Even before the 1986 enactment of these four QMB provisions, HHS had long taken the position that the buy-in scheme required states to reimburse providers for Part B copayments only in an amount equal to the difference, if any, between the Medicaid payment and the eighty percent of the Medicare Part B charge that the federal government pays. *See* Policy Information Memorandum from Director, Bureau of Program Policy, Department of Health and Human Services, to Associate Regional Administrators (Sept. 29, 1981) ("California's payment of amounts only up to its standard maximum allowable rate under its [Medicaid] program is acceptable."); Policy Information Memorandum No. 6 from Associate Commissioner for Program Coordination, Department of Health, Education and Welfare, to Health Services Administration Regional Staff (Mar. 4, 1971) ("[T]he [state] agency is not necessarily obligated to pay the full

amount of the deductibles and co-insurance costs according to the rates established under [Medicare], but only that amount which will satisfy the requirement for payment in full according to the [Medicaid] method of payment."). HHS reiterated this policy following the 1986 amendments to the buy-in scheme. *See* DEP'T OF HEALTH & HUMAN SVCS., STATE MEDICAID MANUAL § 3490.14 (1991).

In 1990, the District of Columbia (a state for Medicaid purposes) amended its Medicaid program to limit reimbursement for QMB Part B copayments to the Medicaid rate. *See* 37 D.C.Reg. 5593 (1990). HHS approved the District's plan in 1991. The District implemented its plan for more than six years without challenge.

In 1997, a coalition of D.C. doctors and the Medical Society of the District of Columbia sued the city in the Superior Court for the District of Columbia, claiming that the buy-in statutes required states to pay QMB Part B copayments in full. Alleging breach of contract, unjust enrichment, and promissory estoppel, the doctors sought retroactive reimbursement. The doctors also sued the District for injunctive relief in the United States District Court for the District of Columbia. The city removed the first suit to federal court, where the two cases were consolidated.

One month later, Congress enacted the Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251 ("Budget Act"). Section 4714(a) of the Budget Act, entitled "Clarification Regarding State Liability for Medicare Cost–Sharing," expressly authorized states to limit Medicare cost-sharing payments for QMBs based on Medicaid rates. *See id.* § 4714(a), 111 Stat. at 509–10. Section 4714(c) applied this putative "clarification" retroactively to any pending lawsuit seeking reimbursement from states under the buy-in program. *See id.* § 4714(c), 111 Stat. at 510. Recognizing the prospective validity of section 4714(a), the doctors abandoned their request for injunctive relief. Instead, they amended their complaint to challenge the constitutionality of section 4714(c)'s retroactivity provision, claiming that it violates the Takings and Due Process Clauses of the Fifth Amendment as well as principles of separation of powers. The United States intervened to defend the constitutionality of the retroactivity provision.

The district court upheld section 4714(c), concluding:

> [O]ne thing is clear: the law regarding state liability to pay for the health services provided to QMBs has never been crystal clear. Section 4714 has certainly provided clarification where it was needed. For this reason, the Court concludes that applying section 4714 retroactively, as Congress directed, is not impermissible under the Constitution.

*McCreary v. Offner*, 1 F.Supp.2d 32, 37 (D.D.C.1998). Because section 4714's clarification of the buy-in scheme undermined the theory of the doctors' breach of contract action—that pre–1997 law required reimbursement at Medicare rates—the district court granted summary judgment for the District. *See id.* The doctors appeal. Our review is de novo. *See Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 491–92 (D.C.Cir.1998).

II

According to the doctors, pre–1997 law clearly required states to reimburse them for all Part B cost-sharing obligations incurred by QMBs. The Budget Act, they argue, could not constitutionally change that requirement retroactively. The United States (supported by the District) responds that: (1) pre–1997 law was ambiguous regarding state cost-sharing obligations, and under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we must defer to HHS's reasonable interpretation of that scheme; (2) even if *Chevron* deference to HHS's interpretation of the pre–1997 scheme is inappropriate, under *Loving v. United States*, 517 U.S. 748, 116 S.Ct. 1737, 135

L.Ed.2d 36 (1996) we should give deference to *Congress's* 1997 interpretation of the prior scheme, as did the district court; and (3) if the Budget Act did change the buy-in scheme retroactively, then the doctors' constitutional arguments fail on the merits. Mindful of our obligation to avoid constitutional questions when possible, *see Ashwander v. TVA*, 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), we begin by addressing the government's *Chevron* argument. After all, if *Chevron* deference to HHS's interpretation of pre–1997 law is appropriate, we must sustain the District's reimbursement cap without regard to the Budget Act.

The doctors insist—as they must to avoid *Chevron* deference—that before 1997 sections 1396a(a)(10)(E) and 1396d(p)(3)(D) unambiguously required states to reimburse providers in full for copayments for Part B services performed on QMBs. They argue that the permissive "may" language in section 1396a(n) comports with this reading, interpreting that section simply to authorize states to deviate from their otherwise rigid Medicaid payment schedules. According to the doctors, section 1396a(n) did nothing more than provide an exception to the general rule that states must never reimburse Medicaid providers in excess of HHS-approved schedules. Section 1396a(n) used the permissive "may" instead of the mandatory "shall," the doctors contend, because state Medicaid rates occasionally *exceed* the Medicare rates for the same service.

The doctors' interpretation of the buy-in statutes is certainly plausible. But as we read the pre–1997 statutes and their legislative history, we think Congress has not so "unambiguously expressed" its intent as to make the doctors' interpretation mandatory. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; *see also Air Transp. Ass'n of America v. FAA*, 169 F.3d 1, 2 (D.C.Cir.1999) ("Although the inference petitioner would draw as to the statute's meaning is not by any means unreasonable, it is also not inevitable.").

To begin with, if the buy-in statutes really spoke as clearly as the doctors contend, section 1396a(n) would have had no need to provide separately that states could deviate from their otherwise mandatory Medicaid schedules. Addressing the same issue, the Seventh Circuit put it this way: "[I]f ... [sections 1396a(a)(10)(E) and 1396d(p)(3)(D) of] the statute *clearly* entitle[ ] [providers] to reimbursement at Medicare rates (if it is not clear, *Chevron* is back in play), the state could hardly be penalized for such reimbursement. That would be penalizing it for complying with the statute." *Paramount*, 138 F.3d at 709; *see also Rehabilitation Ass'n v. Kozlowski*, 42 F.3d 1444, 1469 (4th Cir.1994) (Niemeyer, J., dissenting) ("It is utterly implausible, I submit, to believe that Congress would create a new section in the [Medicaid] Act solely to acknowledge that it is permissible for states to do what Congress *requires* them to do in other sections."). The United States makes this argument, but the doctors nowhere respond.

The government also points out that the very provision from which the doctors derive a state obligation to pay cost-sharing in full—section 1396a(a)(10)(E)(i)—requires that *state plans* make cost-sharing available for QMBs. Because states must detail their QMB cost-sharing policies in their Medicaid regulations before submitting those regulations to HHS for approval, the argument goes, states' cost-sharing obligations could never cause them to run afoul of their own regulations. This argument makes sense. Again, the doctors nowhere respond.

The doctors' interpretation of section 1396a(n) suffers from another problem. During the almost twenty years prior to its enactment, states often reimbursed providers for Medicare cost-sharing in excess of Medicaid rates. Why then did Congress

need to enact section 1396a(n) to authorize such reimbursement? *See Paramount,* 138 F.3d at 709 (making this point). The doctors point out that during the twenty years prior to the enactment of section 1396a(n), states had not used Medicaid funds to pay cost-sharing for "pure QMBs" (QMBs not otherwise eligible for Medicaid) because the QMB program did not even exist during that period. True as that may be, the doctors cannot dispute that by 1986 states had often exceeded their own Medicaid rates with respect to dual eligibles.

The doctors claim to find support for their position in the House Report accompanying the 1986 enactment of the QMB program, which stated that "the Medicaid program would pay the Part B deductible and the beneficiary's 20 percent coinsurance." H.R.REP. No. 99–727, at 106 (1986), *reprinted in* 1986 U.S.C. 3607, 3696. But because this language did not speak to whether states must make the entire co-payment even in excess of Medicaid rates, it helps the doctors little. Moreover, subsequent legislative history squarely conflicts with the doctors' interpretation of the buy-in program. The House Report accompanying the 1988 amendments said:

> It is the understanding of the Committee that, with respect to dual Medicaid–Medicare eligibles, some States pay the coinsurance even if the amount that Medicare pays for the service is higher than the State Medicaid payment rate, while others do not. Under the Committee bill, States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare—i.e., 80 percent of the reasonable charge—exceeds the amount Medicaid would pay for the same item or service.

H.R.REP. No. 100–105(II), at 61 (1987), *reprinted in* 1988 U.S.C.C.A.N. 857, 884; *see also* H.R.REP. No. 101–247, at 364 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2090 ("The Medicaid programs typically pay the Medicare coinsurance only to the extent that their payment, plus the Medicare payment, does not exceed what the Medicaid program would pay for the service in question.... The Committee bill ... does not change the current policy regarding the amount which a Medicaid program must reimburse on such claims."). Although post-enactment legislative history may or may not be a valid tool for ascertaining congressional intent, *see United States v. Carlton,* 512 U.S. 26, 39, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (Scalia, J., concurring) (referring to "post-legislation legislative history" as an "oxymoron"), our task here is not to divine conclusively the meaning of section 1396a(n), but rather to determine whether it is reasonably susceptible to more than one meaning. With respect to this question, post-enactment legislative commentary offering a plausible interpretation is certainly relevant, much like plausible interpretations from litigants, other courts, law review articles, or any other source would be. The fact that the 1988 and 1989 House Reports interpreted section 1396a(n) differently from the interpretation favored by the doctors suggests that the statute is far from unambiguous.

We have a similar reaction to four pre-Budget Act circuit court decisions that found the buy-in scheme unambiguous. *See Haynes Ambulance Serv., Inc. v. Alabama,* 36 F.3d 1074, 1077 (11th Cir.1994) (per curiam); *Pennsylvania Med. Soc'y v. Snider,* 29 F.3d 886, 891–902 (3d Cir.1994); *Rehabilitation Ass'n,* 42 F.3d at 1451–58; *New York City Health & Hospitals Corp. v. Perales,* 954 F.2d 854, 858–59 (2d Cir. 1992). Although all four circuits found the statutes sufficiently clear to preclude *Chevron* deference, they were not unanimous about the meaning of the supposedly unambiguous scheme. The Second, Third, and Eleventh Circuits essentially adopted the interpretation the doctors urge in this case. The Fourth Circuit expressly rejected this reading, as well as the position HHS took there (and takes here). Instead, it held that section 1396a(n) allowed states to pay more cost-sharing for pure

QMBs than for dual eligibles. *See Rehabilitation Ass'n,* 42 F.3d at 1454–55. The plausibility of these competing interpretations simply confirms our view that the buy-in scheme is ambiguous. *See Smiley v. Citibank,* 517 U.S. 735, 739, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("In light of the two dissents from the opinion of the Supreme Court of California, and in light of the opinion of the Supreme Court of New Jersey creating the conflict that has prompted us to take this case, it would be difficult indeed to contend that the [statute] is unambiguous with regard to the point at issue here.") (citation and footnote omitted).

## III

Proceeding to the second step of the *Chevron* inquiry, we ask whether HHS has reasonably interpreted the buy-in statutes. The United States's position is simple: Because the word "may" in section 1396a(n) is permissive, not mandatory, states are allowed to but need not exceed their Medicaid rates. To us, this seems eminently reasonable—"may" means may.

The doctors make only one argument challenging the reasonableness of HHS's interpretation. Relying on *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), which stated that "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view," the doctors claim that HHS has not consistently interpreted the buy-in statutes. In support, they cite the following commentary from a 1983 HHS rulemaking:

> Since 1971, HHS policy has been to require State agencies that have a "buy-in" agreement to pay, in addition to the Part B premium, the Part B coinsurance and deductible amount for services provided to beneficiaries under Part B, even if the services are not routinely provided under the Medicaid State Plan.

48 Fed.Reg. 10,378, 10,379 (1983) (notice of proposed rulemaking). That rulemaking has no relevance to the question presented here, however, because there HHS merely concluded that the buy-in program does not require states to pay Part B cost-sharing for services not covered by their Medicaid plans; the rulemaking did not address whether a state must pay QMBs' full copayments for services that *are* covered under its Medicaid plan. The most relevant commentary in the rulemaking, moreover, actually comports with the position HHS takes in this case: "[I]f a State limits the amount, duration or scope of Medicaid services covered in the State plan, then the State may similarly limit payment of Medicare Part B cost sharing amounts on those same services in accordance with its Medicaid service limitations." 52 Fed.Reg. 47,926, 47,928 (1987) (final rule). Not only does this rulemaking suggest no agency inconsistency, but the doctors have failed to cite any other instances of alleged agency inconsistency in the twenty-eight years since HHS first articulated its copayment reimbursement policy. Indeed, HHS appears to have approved the Medicaid plans of every state that has chosen to limit total copayment reimbursement to Medicaid rates.

Because we conclude that HHS's interpretation of the buy-in statutes is reasonable, we have no need to reach the doctors' constitutional challenge to the Budget Act. The district court's grant of summary judgment for the District is affirmed.

*So ordered.*