RANDOLPH,
Circuit Judge, dissenting:
My disagreement with the majority is about not only its logic but also its starting points, one of the most prominent of which is derived from Ass’n of American Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898 (D.C.Cir.1993) (AAPS). There is a serious constitutional problem in AAPS’s interpretation of the Federal Advisory *291 Committee Act (FACA), 5 U.S.CApp. § 1 et seq. - a problem this case exposes. As applied to committees the President establishes to give him advice, FACA has for many years teetered on the edge of constitutionality. See Jay S. Bybee, Advising the President: Separation of Powers and the Federal Advisory Committee Act, 104 Yale L.J. 51 (1994). The decision in this case pushes it over.
The case comes to us in a peculiar posture. We have mandamus on top of mandamus. Both sides have invoked the All Writs Act, 28 U.S.C. § 1361. The federal officers have petitioned this court for a writ of mandamus barring discovery. In the district court, plaintiffs sought a writ of mandamus ordering the federal officers to comply with FACA.[1] Mandamus, the majority tells us, is “drastic”; it is available only in “extraordinary situations”; it is hardly ever granted; those invoking the court’s mandamus jurisdiction must have a “clear and indisputable” right to relief. These words are directed at the federal officers’ petition in this court, but they apply equally to plaintiffs’ suits in the district court. See Power v. Barnhart, 292 F.3d 781, 784 (D.C.Cir.2002). In my view, the federal officers have a clear right to relief in the court of appeals because the plaintiffs do not have a clear right to relief in the district court. I would therefore grant the writ and order the district court not only to bar discovery but to dismiss the actions.
“The President ... may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices.... ” U.S. Const. art. II, § 2, cl. 1.
In January 2001 President Bush sought advice on energy policy. To that end, he established, in the Executive Office of the President, the National Energy Policy Development Group. The President named to this task force the Vice President; the Secretaries of Treasury, Interi- or, Agriculture, Commerce, Transportation, and Energy; the Director of the Federal Emergency Management Agency; the Administrator of the Environment Protection Agency; and three Assistants to the President. The President authorized the Vice President to invite “as appropriate, other officers of the Federal Government.” The Group’s mission was to “develop a national energy policy designed to help the private sector” and State and local governments, “to gather information, deliberate, and ... make recommendations to the President.” In May 2001 the Group issued its recommendations to the President. The Group’s final report listed, as its members, the officials the President appointed in his January directive plus the Secretary of State and the Director of the Office of Management and Budget. See National Energy Policy Development Group, National Energy *292 Policy: Report of the National Energy Policy Development Group (2001), available at http://www.whitehouse.gov/energy/National-Energy-Policy.pdf.
If the President’s Energy Policy Group were an “an advisory committee” within the meaning of FACA, the President was required to make its membership “fairly balanced.” 5 U.S.CApp. § 5(b)(2). If FACA applied, the Group should have filed a detailed “charter” with the General Services Administration (GSA) before the Group began operating. Id. § 9(c). It should have held its meetings open to the public and allowed interested persons to file comments. Id. § 10(a)(1). It should have given notice of its meetings in the Federal Register. Id. § 10(a)(2). It should have kept detailed minutes of each meeting and “a complete and accurate description of matters discussed and conclusions reached.” Id. § 10(c). And it should have made available to the public its “records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda” and other documents. Id. § 10(b).
There is no doubt that these requirements would violate the separation of powers if they were imposed on all groups formed by the President for the purpose of providing him advice. See Bybee, supra. And so FACA contains an exemption for committees “established or utilized” by the President when the committees are “composed wholly of full-time ... officers or employees of the Federal Government.” 5 U.S.C.App. § 3(2). On the face of it, the Energy Policy Group, consisting only of high-level federal officials, was thus exempt from FACA.
But plaintiffs, relying on AAPS, alleged that the Group nevertheless was a FACA advisory committee. AAPS held that an outside consultant may “be properly described as a member of an advisory committee if his involvement and role are functionally indistinguishable from those of the other members,” thus rendering the entire committee subject to FACA. 997 F.2d at 915. It is far from clear where the AAPS court derived its holding. No section of FACA was cited. The opinion purports to be interpreting the word “member,” but the operative provision - quoted in the preceding paragraph - does not use that word. The AAPS court knew that an inquiry into functional equivalency would be fact-bound, and so it authorized discovery. Id. at 915-16.
It is this holding in AAPS that enabled plaintiffs - through allegations that private citizens were de facto members of the Energy Policy Group - to avoid a motion to dismiss, and it is this holding that led directly to the discovery order we have before us. Judicial Watch’s complaint names four private individuals and alleges that they “regularly attended and fully participated in non-public meeting of the [Energy Policy Group] as if they were members.” Judicial Watch Compl. at 8-9. The Sierra Club’s complaint is more general: it alleges that “[e]nergy industry executives, including multiple representatives of single energy companies, and other non-federal employees, attended meetings and participated in the activities of the Cheney Energy Task Force and Task Force SubGroups.” Sierra Club Compl. at 6. The allegations are on information and belief.
Given AAPS’s formulation, extensive discovery into the Executive Office of the President is inevitable. Functional equivalency, as AAPS contemplated, invites a comparative judgment. One cannot know whether a private individual acted like a member of a Presidential committee unless one knows how the members acted. And so plaintiffs proposed, and the district court approved, free range discovery: interrogatories asking for descriptions of all the activities of all individuals - members *293 and staff alike - who were involved in the work of the Energy Policy Group, and requests for documents detailing all communications between those working for the Group and their governmental departments with persons who were not full-time federal employees. The approved discovery plan also contemplates depositions.
My colleagues are confident that the district court can réin in the discovery, but I cannot see how this can be done in any non-arbitrary way. The AAPS opinion provides no standards. And my colleagues never articulate their conception of de facto membership. Left open is an extensive area to be explored in depositions, interrogatories, and document production. Consider just a few of the possibilities. Suppose it turns out that a private individual attended 6 of the Group’s 12 meetings. Would that make him a de facto member? Would it matter if discovery revealed that some of the members the President appointed attended the same number of, or even fewer, meetings? What if the private individual attended all meetings but did not speak, or was present only for a short period each time? Would it matter whether the private individual had a place at the table or sat on the side with the Group’s staff? Or whether the private individual attended only a few meetings, but was quite influential in the formulation of the final recommendations? Should there be discovery into what impact the person’s presence or statements had on the other members, and how would that discovery proceed? Suppose the private individual submitted memoranda or other documents. Is there to be discovery for the purpose of determining whether the other members of the Group took those documents into account in performing their information gathering function or in formulating their view of energy policy? (One of the complaints alleges that a corporate CEO handed the Vice President a three-page memorandum on the subject of energy.) Would it be of any consequence that the private person met individually with some of the members the President appointed? (There are also allegations to this effect.) And if so, is there to be discovery of who said what, and how this affected the work of the Group?
These problems and others are a direct result of AAPS and its lack of any principled standard for determining who is and who is not a de facto member of a Presidential committee. For the judiciary to permit this sort of discovery, authorized in the name of enforcing FACA - a statute providing no right of action, see supra note 1 - strikes me as a violation of the separation of powers. The intrusion into the inner workings of the Presidency, the disruption this intrusion is bound to entail, the probing of the mental processes of high-level Cabinet officers inherent in the type of discovery that AAPS sanctions, the deleterious impact on the advice the President needs to perform his constitutional duties - all this and more present “formidable constitutional difficulties,” as the Supreme Court acknowledged in Public Citizen v. Department of Justice, 491 U.S. 440, 466, 109 S.Ct. 2558, 2572-73, 105 L.Ed.2d 377 (1989); see also id. at 488, 109 S.Ct. at 2584 (Kennedy, J., joined by the Chief Justice and O’Connor, J., concurring in the judgment). In fact, I believe the “constitutional difficulties” here are even more “formidable” than they were in Public Citizen. Even outside the Executive Office of the President, courts do not allow this sort of discovery into the internal workings of government departments without “strong preliminary showings of bad faith.” Nat’l Nutritional Foods Ass’n v. FDA, 491 F.2d 1141, 1145 (2d Cir.1974) (Friendly, J.). As we held in Checkosky v. SEC, 23 F.3d 452, 454, 489 (D.C.Cir.1994) (opinion of Randolph, J.), unless there has been such a showing - here there was none - “agency deliberations, like judicial deliberations, are for similar reasons privileged from dis *294 covery,” as are intra-agency memoranda and other documents recording how and why decisions or recommendations have been reached. “Requiring an agency to produce such internal materials and allowing litigants to depose agency officials ... would be warranted only in the rarest of cases.” Id[2]
The majority and concurring opinions, citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 825-26, 28 L.Ed.2d 136 (1971), insist that discovery is permissible here because the “administrative record” is inadequate. Those who forget the reason for a rule are apt to misapply it. I can think of no better illustration than what has occurred here. My colleagues have entirely ignored why the Supreme Court said it might be necessary to take testimony: the administrative record in Overton Park was not before the Court, and the administrative officials had not explained their action. This created a gap, a gap that needed filling because § 706 of the Administrative Procedure Act, 5 U.S.C. § 706, required the reviewing court to consider “the whole record” in determining whether the agency action was supported by substantial evidence. 401 U.S. at 419-20, 91 S.Ct. at 825-26.[3] But in this case there is no gap in an administrative record. The Energy Policy Group was not an administrative agency; it was not required to make findings of fact and conclusions of law in order to enable judicial review under the APA; and the officials the President named to the group were not agency officials within the meaning of the APA. See supra note 1. Neither the district court nor this court would conduct judicial review under § 706 of the APA, yet that was the source of the Overton Park holding on which the majority relies.[4] See supra note 1. To state what remains of the majority’s rationale is to refute it: because Presidential committees are not APA agencies there is no administrative record; therefore there must be discovery to compile an administrative record adequate for judicial review under the APA even though the APA does not apply and even though there will be no such judicial review.
The majority also maintains that there is no “harm” to the Presidency, that if discovery probes too extensively, all the federal officials need do is assert executive privilege or any other privilege that might be available. Maj. op. at 1103-1105. The unstated premise of the majority’s view is that the only potential harm would be in the revelation of privileged material and that the federal officers are fully capable of making sure this does not occur. If this *295 were an adequate answer, department heads and agency officials would regularly be subject to discovery; they too could protect themselves by asserting privileges.
The majority’s no-harm proposition is especially ill founded in this case. The Energy Policy Group was part of the Executive Office of the President. If executive privilege is to be asserted, it therefore appears that the President must make the decision. “There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.” United States v. Reynolds, 345 U.S. 1, 7-8, 73 S.Ct. 528, 531-32, 97 L.Ed. 727 (1953) (footnotes omitted); see In re Sealed Case, 121 F.3d 729, 744 n. 16 (D.C.Cir.1997). Already the government has voluntarily produced some 36,000 pages of documents in this matter. How many additional documents are potentially subject to discovery we do not know. But it is obvious that decisions to assert privileges must be made document by document and often line by line. With respect to interrogatories and depositions, the decisions about privilege must be made question by question. Each such assertion will trigger yet another round of proceedings in the district court, unless the plaintiffs acquiesce in the President’s judgment. In all of this the President will be distracted and diverted from the performance of his constitutional duties and responsibilities. The Supreme Court recognized as much in Nixon v. Fitzgerald, 457 U.S. 731, 751,102 S.Ct. 2690, 2702, 73 L.Ed.2d 349 (1982): “Because of the singular importance of the President’s duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government.” See also Clinton v. Jones, 520 U.S. 681, 694 n. 19, 117 S.Ct. 1636, 1644 n. 19, 137 L.Ed.2d 945 (1997) (reiterating that the President generally should not be burdened with suits challenging his official conduct).
If Congress, in order to ensure that outsiders did not have “undue influence,” had passed a law requiring all groups within the Executive Office of the President to disclose publicly not only their advice to the President but also all their records, I am confident the law would be struck down as a violation of the separation of powers. My confidence in the unconstitutionality of such a law is not lessened by the prospect that the President might resist some disclosure by invoking executive privilege. See Public Citizen, 491 U.S. at 488-89, 109 S.Ct. at 2584 (Kennedy, J., concurring in the judgment). Discovery on the basis of allegations of defacto membership cannot be distinguished from such a law. Any Presidential committee that consults anyone outside of government, or is suspected to have done so, is potentially subject to discovery into its inner workings. All a plaintiff has to do is bring a mandamus action and allege that private individuals had some ill-defined role in a committee of federal officers advising the President. And according to the majority opinion, the court of appeals is powerless to prevent this.
Although more could be said, I will not dwell further on the constitutional problems raised by today’s decision. I believe those problems may be avoided on the basis of a regulation apparently not brought to the court’s attention in AAPS - a regulation that is contrary to the defacto member doctrine. Once that doctrine is cast aside, as it surely must be, see McCreary v. Offner, 172 F.3d 76, 81 (D.C.Cir.1999), it becomes apparent that the district court did not have jurisdiction and that the complaints must be dismissed.[5]
*296 At the time the President formed the Energy Policy Group and during the time plaintiffs allege non-federal personnel attended its meetings, a GSA regulation defined “committee member” to mean “an individual who serves by appointment on a committee and has the full right and obligation to participate in the activities of the committee, including voting on committee recommendations.” 41 C.F.R. § 101-6.1003 (2000).[6] As in AAPS, the defendants in this case did not mention the regulation in their briefs or at oral argument. Nevertheless we must deal with it, for two reasons.
First, the regulation affects the mandamus jurisdiction of the district court. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 95, 118 S.Ct. 1003, 1012-13, 140 L.Ed.2d 210 (1998). Plaintiffs have not alleged that any of the private individuals they have in mind ever “servefd] by appointment” to the Energy Policy Group. They have not alleged, in terms of the regulation, that any of these individuals had an “obligation” to serve on the Group or that any of them had the right to vote on matters coming before it.[7] As I wrote in the beginning of this opinion, in mandamus it must appear on the face of the pleadings that the plaintiffs have a “clear” right to relief. See Power v. Barnhart, 292 F.3d at 784; see also Ahmed v. Dep’t of Homeland Sec., 328 F.3d 383, 386-87 (7th Cir.2003). In the absence of any allegations satisfying the regulatory definition of “member,” plaintiffs had no clear right to relief and the district court therefore did not have jurisdiction.
The other reason is that relying on the regulation rather than the de facto member doctrine of AAPS avoids the constitutional difficulties this sort of FACA litigation poses, much in the same way the Supreme Court avoided those difficulties in Public Citizen, 491 U.S. at 466-67, 109 S.Ct. at 2572-73. See Meredith Corp. v. FCC, 809 F.2d 863, 872 (D.C.Cir.1987).[8]
*297 The validity of GSA’s definition of “member” cannot be doubted. GSA is “the agency responsible for administering FACA.” Public Citizen, 491 U.S. at 463 n. 12, 109 S.Ct. at 2572 n. 12. It is charged, in § 7(c) with the duty “to prescribe administrative guidelines,” which § 8(a) refers to as “directives.” And under § 4(a), regulations GSA promulgates under FACA “shall apply to each advisory committee.” I recognize that the Court in Public Citizen gave “diminished deference” to another GSA regulation implementing FACA, without mentioning Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984).[9] But even if GSA’s regulation is not entitled to Chevron deference, and should receive only whatever deference is due under Skidmore,[10] I would apply the regulation to this case in light of the problems of adhering to the de facto member doctrine of AAPS. Cf. University of Great Falls v. NLRB, 278 F.3d 1335, 1340-41 (D.C.Cir.2002). The regulation has the added advantage of enabling the President, at the time of formation of his committee, to determine whether the committee must comply with the many requirements FACA imposes. The de facto membership doctrine, in contrast, will almost invariably require an after-the-fact determination, contemplating as it does an examination of what role a private individual played throughout the committee’s life.
In short, I would issue the writ of mandamus and send the case back to the district court with instructions to dismiss the complaints.

. Mandamus was the only basis upon which the actions could have proceeded in the district court. All agree that FACA does not itself create a cause of action. It is also clear that the Administrative Procedure Act, which plaintiffs invoked, does not apply. The alleged FACA "advisory committee” here was not an "agency” within the meaning of the APA. See Meyer v. Bush, 981 F.2d 1288, 1297-98 (D.C.Cir.1993). It was part of the Executive Office of the President. The President is not subject to the APA, and neither are units within the Executive Office whose sole function is to advise the President. See Franklin v. Massachusetts, 505 U.S. 788, 801, 112 S.Ct. 2767, 2775-76, 120 L.Ed.2d 636 (1992); Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 971-72, 63 L.Ed.2d 267 (1980).
Why the majority analyzes (maj. op. at 1103) the adequacy of the administrative record in terms of the APA is therefore a mystery. Stranger still is the majority’s insistence that there even must be an administrative record. See supra pp. 1102-1103.

. None of the material sought in discovery here would be available through the Freedom of Information Act (FOIA). The Supreme Court held in Kissinger v. Reporters Committee for Freedom of the Press that FOIA does not cover "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.” 445 U.S. 136, 156, 100 S.Ct. 960, 971-72, 63 L.Ed.2d 267 (1980) (internal quotation marks omitted).

. "Even on those rare occasions when [discovery pursuant to Overton Park] is appropriate, the district court is not engaged in ordinary fact-finding, but instead is filling in gaps in tire record to determine what the agency actually did.” Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1227 (D.C.Cir.1993).

.Even in APA cases, "if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry” - which is precisely what the majority has allowed the district court to do. Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

. Contrary to the implication of the majority, the federal officers have repeatedly argued *296 before the district court and this court that the discovery, as permitted by AAPS, violates the separation of powers. See, e.g., Emergency Pet. For Writ of Mandamus at 14-15; Judicial Watch, Inc. v. Nat'l. Energy Policy Dev. Group, 219 F.Supp.2d 20, 46 (D.D.C.2002). The problem here is not that tire defendants failed to make the arguments. The problem is that the majority failed to answer them.

. On August 20, 2001, the General Services Administration redefined "committee member” to mean “an individual who serves by appointment or invitation on an advisory committee or subcommittee.” Federal Advisory Committee Management, 66 Fed. Reg. 37,728, at 37,734 (July 19, 2001) (codified at 41 C.F.R. § 102-3.25). FACA does not authorize retroactive rulemaking, and there is no indication that this regulation was meant to be retroactive. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 471-72, 102 L.Ed.2d 493 (1988).

. If the regulation controls and if plaintiffs had made these allegations, it would have been a simple matter to determine whether evidence supported the claims. Wide ranging discovery of the sort approved here would be unnecessary and improper. For instance, only the President, and through his directive, the Vice President, had the authority to appoint members to the Group, and even then ihe authority was limited to full-time government employees.

.The majority contends that the court is bound by AAPS to permit discovery to determine de facto membership. Maj op. at 1 107— 1108; see also concurring op. at 1111-1112. However, AAPS did not consider the GSA regulation, nor did it address the constitutional issues presented by authorizing discovery. Accordingly, AAPS's holding does not preclude the court from considering these points. See Hagans v. Lavine, 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974); United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37-38, 73 S.Ct. 67, 69-70, 97 L.Ed. 54 (1952); see also Legal Services Corp. v. Velazquez, 531 U.S. 533, 557, 121 S.Ct. 1043, 1057, 149 L.Ed.2d 63 (2001) (Scalia, J., dissenting).

. 491 U.S. at 463 n. 12, 109 S.Ct. at 2572 n. 12. The Court gave several reasons, among which were that the regulation was not a “contemporaneous construction” of FACA because it was not promulgated until years after the statute came into effect, and that GSA's regulations did “carry the force of law.” Id. See generally Thomas W. Merrill & Kathryn Tongue Watts, Agency Rules with the Force of Law: The Original Convention, 116 Harv. L. Rev. 467 (2002).

. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).