KAREN LECRAFT HENDERSON, Circuit Judge,
dissenting in part:
In my view, the Congress unambiguously intended to authorize per-click equipment leases. I therefore do not believe the per-click ban, • 42 C.F.R. § 411.357(b)(4)(ii)(B), satisfies the first step of Chevron and respectfully dissent from Part II.A of the majority opinion.
The Stark Law broadly prohibits self-referrals: if a doctor has a financial interest in an entity, he cannot refer patients to that entity for designated health services. 42 U.S.C. § 1395nn(a). Nevertheless, the Stark Law contains multiple exceptions. Id. § 1395nn(b)-(e). This case involves the equipment exception. Id. § 1395nn(e)(l)(B). A physician can lease *228 equipment to an entity — and refer patients to it — if:
(i) the lease is set out in writing, signed by the parties, and specifies the equipment covered by the lease,
(ii) the equipment rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee when being used by the lessee,
(iii) the lease provides for a term of rental or lease of at least 1 year, the rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties,
(iv) the lease would be commercially reasonable even if no referrals were made between the parties, and
(v) the lease meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.
Id. (emphases added). The Centers for Medicare and Medicaid Services (CMS or Agency) relied on subsection (vi) to enact the per-click ban, which ban specifies that an equipment lease can no longer utilize “[p]er-unit of service rental charges.” 42 C.F.R. § 411.357(b)(4)(ii)(B) (emphasis added). The question is whether the CMS can use its “other requirements” authority to ban per-click leases. I think not.
An agency cannot use its delegated authority in a way that contradicts the Congress’s unambiguous intent. See Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 134-35, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (“Although the [agency] has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, it does not have the power to adopt a policy that directly conflicts with its governing statute.” (citation omitted)); cf. AFL-CIO v. Chao, 409 F.3d 377, 384 (D.C.Cir.2005) (“Even when Congress has stated that the agency may do what is ‘necessary,’ ” the agency “cannot render nugatory restrictions that Congress has imposed.” (citation omitted)). As a matter of first principles, an agency is not entitled to Chevron deference unless the Congress “has left a gap for the agency to fill.” Am. Bar Ass’n v. FTC, 430 F.3d 457, 468 (D.C.Cir.2005). If the Congress has “directly spoken” to the issue in question, there is no such gap. Ry. Labor Execs.’ Ass’n v. Nat’l Mediation Bd., 29 F.3d 655, 671 (D.C.Cir.1994) (en banc) (quoting Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); see also Util. Air Reg. Grp. v. EPA, — U.S. —, 134 S.Ct. 2427, 2445, 189 L.Ed.2d 372 (2014) (“Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress.” (quotation marks omitted)). An agency crosses an impermissible line when it moves from interpreting a statute to rewriting it. See La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 376, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (“As we so often admonish, only Congress can rewrite [a] statute.”); NRDC v. Adm’r, EPA, 902 F.2d 962, 977 (D.C.Cir.1990) (“It hardly bears noting that [the agency’s] discretion cannot include the power to rewrite a statute and reshape a policy judgment Congress itself has made.”), vacated in other part, 921 F.2d 326 (D.C.Cir.1991). Even if the Congress wanted to authorize agency rewrites, the Constitution would stand in its way. See Util. Air Reg. Grp., 134 S.Ct. at 2446 (“Under our system of government, Congress makes laws and the President, acting at times through agencies ..., *229 faithfully executes them.” If agencies could “modify unambiguous requirements imposed by a federal statute,” it “would deal a severe blow to the Constitution’s separation of powers.” (quotation marks and alteration omitted)); see also id. at n. 8 (“[W]e shudder to contemplate the effect that such a principle would have on democratic governance.”).
The CMS contends that it can always use its “other requirements” authority to narrow the scope of the equipment exception, prohibit more conduct and remain consistent with the Stark Law. But the Agency takes an overly simplistic view of congressional intent. Legislation is often the product of “compromise between groups with ... divergent interests,” reflecting a “careful balance” between two extremes. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 93-94, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). “[Ajgencies must respect and give effect to these sorts of compromises.” Id. at 94, 122 S.Ct. 1155. The Stark Law, for example, begins with a broad prohibition on physician self-referrals. See 42 U.S.C. § 1395nn(a). The bulk of the provision, however, consists of exceptions to that general ban. See id. § 1395nn(b)-(e); see also Steven D. Wales, The Stark Law: Boon or Boondoggle? An Analysis of the Prohibition on Physician Self-Referrals, 27 Law & Psy-Chol. Rev. 1, 11 (2003) (“What cannot be done [under the Stark Law] is explained in one sentence.... Exceptions, however, fill nearly nine pages of the statute.”). The exceptions reflect the Congress’s judgment that certain arrangements are net beneficial to patients, regardless of the risks associated with self-referrals. See United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 96 (3d Cir.2009). Thus, when the CMS circumscribes a statutory exception to the Stark Law, it can do as much violence to the Congress’s intent as when it broadens one. See Am. Bankers Ass’n v. SEC, 804 F.2d 739, 754 (D.C.Cir.1986) (agency cannot “change basic decisions made by Congress” (emphasis added)); Guardians Ass’n v. Civil Serv. Comm’n of N.Y., 463 U.S. 582, 615, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (O’Con-nor, J., concurring in the judgment) (“[W]e would expand considerably the discretion and power of agencies were we ... to permit [them] to proscribe conduct that Congress did not intend to prohibit.”).
Moreover, the text of subsection (vi)— authorizing the CMS to promulgate “other requirements” — contains its own limitation. The word “other” means “existing besides, or distinct from, that already mentioned or implied.” Fin. Planning Ass’n v. SEC, 482 F.3d 481, 489 (D.C.Cir.2007) (quoting II The Shorter Oxford English Diotionary 1391 (2d ed.1936, republished 1939)). The CMS cannot use its “other requirements” authority to “redefine” or “override” the statutory conditions set out in the equipment exception. Id. For example, subsection (iii) requires equipment leases to be “at least 1 year” long. 42 U.S.C. § 1395nn(e)(l)(B)(iii). The CMS plainly could not change “1 year” to “6 months” because such a regulation would redefine a statutory requirement, instead of adding a new one. See Fin. Planning Ass’n, 482 F.3d at 489 (“[C]ourts have hesitated to allow [agencies] to use language structurally similar to the ‘other [requirements]’ clause ... to redefine ... specific requirements in existing statutory exceptions.”) (citing Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)).
Applying these principles here, we first determine whether another provision of the equipment exception already addresses the propriety of per-click leases. Subsection (iv),. which discusses rent, is the most natural candidate. Under subsection (iv), “the rental charges over the term of the *230 lease” must not be “determined, in a manner that takes into account the volume or value of any referrals or other business generated between the parties.” 42 U.S.C. § 1395nn(e)(l)(B)(iv) (emphases added). The key inquiry, then, is whether the “rental charges” in a per-click lease “take[ ] into account the volume” of patient referrals. The per-click ban cannot stand unless the answer is “Yes” or “It’s ambiguous.”
Mathematically, a per-click lease can be expressed as Y = R-X, with Y as the physician’s total rental income, R as the charge per. patient and X as the number of patients served. The term “rental charges” in subsection (iv) can have two meanings. On the one hand, “rental charges” may refer to the variable Y. If “rental charges” means “rental income,” then per-click leases do not qualify for the equipment exception. A per-click lease would “take[ ] into account the volume” of referrals because the physician’s rental income would depend directly on the number of patients he refers. On the other hand, “rental charges” may refer to the variable R in the equation above (ie., the per-patient rate). If a per-click lease charges a flat per-patient rate over the term of the lease, it does not “take into account the volume” of referrals and is therefore eligible for the equipment exception. But if a per-click lease adopts a tiered system — ■ e.g., $1,000 for the first 20 patients, $2,000 for the next 20 patients, $3,000 for the next 20 patients, and so on — it would not qualify. Because the text of the equipment exception is “reasonably susceptible” to either of these interpretations, it is ambiguous. McCreary v. Offner, 172 F.3d 76, 82 (D.C.Cir.1999).[1]
If the text is ambiguous, we do not automatically move to Chevron Step Two. Instead, “a statute may foreclose an agency’s preferred interpretation ... if its structure, legislative history, or purpose makes clear what its text leaves opaque.” Catawba Cnty., NC v. EPA, 571 F.3d 20, 35 (D.C.Cir.2009) (emphasis added); see also Sierra Club v. EPA, 551 F.3d 1019, 1027 (D.C.Cir.2008) (“Although Chevron step one analysis begins with the statute’s text, the court must ... exhaust the traditional tools of statutory construction, including examining the statute’s legislative history....” (emphasis added) (quotation marks omitted)); Am. Bankers Ass’n v. NCUA, 271 F.3d 262, 268, 271 (D.C.Cir.2001) (finding text ambiguous but resolving case at Chevron Step One due to “pellucid” legislative history). In Chevron itself, the Supreme Court did not stop once it found the text ambiguous; it marched on to consider the legislative history as well. See 467 U.S. at 862, 104 S.Ct. 2778; see also FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (legislative history is “certainly relevant” at Chevron Step One); PBGC v. LTV Corp., 496 U.S. 633, 649, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (“legislative history” is one of the “traditional tools of statutory construction” at Chevron Step One).
Much ink has been spilled on the propriety of using legislative history to cloud a clear text under Chevron. See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep’t of Educ., 550 U.S. 81, 90, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007); id. at 105-06 & n. 2, 127 S.Ct. 1534 (Stevens, J., concurring); id. at 108, 127 S.Ct. 1534 (Scalia, J., dis^ *231 senting); see also Halbig v. Burwell, 758 F.3d 390, 406 (D.C.Cir.2014) (identifying “a fork in our precedent” on this issue), reh’g en banc granted, judgment vacated, No. 14-5018, 2014 WL 4627181 (D.C.Cir. Sept. 4, 2014). But the converse — consulting legislative history to clarify an ambiguous text — ought to be uncontroversial. . The chief objection to legislative history is that it can be undemocratic: the Congress qua Congress approves only the text of a statute and the legislative history might reflect a distinctly minority view. See Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005). In the Chevron context, however, a failure to consult legislative history would leave the text ambiguous and thereby transfer authority to an administrative agency, whose democratic accountability is nil. See Free Enter. Fund v. PCAOB, 561 U.S. 477, 499, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (“The growth of the Executive Branch ... heightens the concern that it may slip from the Executive’s control, and thus from that of the people.”). And at least some types of legislative history “shed a reliable light on” the views of a majority of the enacting Congress. Allapattah Servs., 545 U.S. at 568, 125 S.Ct. 2611; see also Simpson v. United States, 435 U.S. 6, 17, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (Rehnquist, J., dissenting) (“[S]ome types of legislative history are substantially more reliable than others. The report of a joint conference committee of both Houses of Congress, for example, ... is accorded a good deal more weight than the remarks ... on the floor of the chamber.”). Legislative history is also criticized for being “murky, ambiguous, and contradictory,” an exercise of “looking over a crowd and picking out your friends.” Allapattah Servs., 545 U.S. at 568, 125 S.Ct. 2611. But again, this criticism loses force under Chevron. If legislative history is “ambiguous” — ie., if both the petitioner and the agency have “friends” they can pick out — then, by definition, the agency prevails under Chevron Step One. See, e.g., Catawba Cnty., 571 F.3d at 38. Sometimes, however, the legislative history is clear, -reliable and uncon-troverted; if it is, we would be wrong to ignore it.
This is one such case. The Conference Report on the 1993 amendments to the Stark Law resolves the textual ambiguity in the equipment, exception. According to the Conference Report:
The conferees intend that charges for ... equipment leases may be based on daily, monthly, or other time-based rates, or rates based on units of service furnished, so long as the amount of the time-based or units of service rates does not fluctuate during the contract period based on the volume or value of referrals between the parties to the lease or arrangement.
H.R.' Rep. No. 103-213, at 814 (1993), 1993 U.S.C.C.A.N. 1088 at 1503 (Conf. Rep.) (emphases added). This legislative history makes clear that the term “rental charges” in subsection (iv) refers to rental “rates,” not total rental income. Thus, so long as the per-patient rate is fixed over the course of the lease, a per-click lease qualifies for the equipment exception. The Conference Report could not have been clearer on this point and the CMS has identified nothing to controvert it. Conference reports, moreover, are the gold standard when it comes to legislative history. See Moore v. Dist. of Columbia, 907 F.2d 165, 175 (D.C.Cir.1990) (en banc) (unanimous) (“conference committee report is the most persuasive evidence of congressional intent after statutory text” (quotation marks omitted)); Planned Parenthood Fed’n of Am., Inc. v. Heckler, 712 F.2d 650, 657 n. 36 (D.C.Cir.1983) (statements in conference reports are “particularly weighty indicators of congressional *232 intent” because they “represente ] the final word on the final version of a statute” and “must be signed by a majority of both delegations from the House and Senate who have resolved the differences between the two chambers” (quotation marks omitted)).
In short, the Conference Report demonstrates that the “rental charges” in a per-click equipment lease do not “take[ ] into account the volume ... of any referrals ... between the parties.” 42 U.S.C. § 1395nn(e)(l)(B)(iv). Per-click leases are therefore eligible for the. equipment exception and the CMS lacks the authority to say otherwise.
Contrary to my colleagues, I do not believe the physician group-practice exception reintroduces any ambiguity. That exception requires that a group’s “compensation per unit of services ” not be “determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties.” Id. § 1395nn(e)(7)(A)(v) (emphasis added). My colleagues contend that the emphasized language shows the Congress “knew how to permit per-click payments explicitly, suggesting that the omission in [the equipment exception] was deliberate.” Maj. Op. 220-21. But the group-practice exception speaks only to “compensation” and, thus, does nothing to illuminate the term “rental charges” in the equipment exception. The interpretative value of this wholly separate exception is therefore minimal. See Weaver v. U.S. Info. Agency, 87 F.3d 1429, 1437 (D.C.Cir.1996) (discounting this canon of statutory construction when “the subject-matter to which the words refer is not the same” (quoting Atl. Cleaners & Dyers v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932))); see also United States v. Wells Fargo Bank, 485 U.S. 351, 357, 108 S.Ct. 1179, 99 L.Ed.2d 368 (1988) (“We cannot attribute to Congress an intent ... by comparing two unrelated provisions of the [statute].”). More importantly, the Conference Report speaks directly to the equipment exception and uses the exact language my colleagues believe is missing: “unit[] of service[s].” H.R. Rep. No. 103-213, at 814, 1993 U.S.C.C.A.N. 1088 at 1503. In my view, this crystalline legislative history supersedes whatever oblique inference is attempted to be teased out of a distinct exception in the Stark Law. See United States v. Stauffer Chem. Co., 684 F.2d 1174, 1184 (6th Cir.1982) (“conference report” can rebut “presumption” that “a difference in language reflects a difference in meaning”) (citing Moore v. Harris, 623 F.2d 908, 914 (4th Cir.1980)); see also Neuberger v. CIR, 311 U.S. 83, 88, 61 S.Ct. 97, 85 L.Ed. 58 (1940) (“The maxim ‘expressio unius est exclusio alteráis’ ... can never override clear and contrary evidences of Congressional intent.”). As this Court has explained before, the argument that the “Congress knows how to say thus and so, and would have written thus and so if that is what it really intended” is “weak.” Doris Day Animal League v. Veneman, 315 F.3d 297, 299 (D.C.Cir.2003). “It may be countered by arguing that if Congress wanted to exclude [per-click leases] from the [equipment exception] it easily could have said as much.” Id. (emphasis added). The text’s “failure to speak with clarity signifies only that there is room for disagreement,” id. — disagreement that, here, the legislative history resolves.
My colleagues minimize the Conference Report because it “states only that rental charges ‘may ’ be based on units of service.” Maj. Op. 221-22 (emphasis added). This Court has repeatedly held, however, that the Congress need not speak in obligatory terms to constrain an agency’s discretion. See Ry. Labor Execs.’ Ass’n, 29 F.3d at 671 (“To suggest ... that Chevron step two is implicated any. time a statute *233 does not expressly negate the existence of a claimed administrative power (i.e. when the statute is not written in ‘thou shalt not’ terms), is both flatly unfaithful to the principles of administrative law ... and refuted by precedent.” (emphasis in original)); Ethyl Corp. v. EPA, 51 F.3d 1053, 1059-60 (D.C.Cir.1995) (rejecting argument that “Congress’s use of the word ‘may’ ” gives agency unbridled discretion and noting that “[w]e refuse ... to presume a delegation of power merely because Congress has not expressly withheld such power”). Otherwise, “agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.” Michigan v. EPA, 268 F.3d 1075, 1082 (D.C.Cir.2001). Here, the Congress said that an equipment lease “may” charge a per-click rate; the CMS is therefore not free to say it “may not.”
My colleagues also note that “the tenet of the Stark Law makes no reference to per-click rates.” Maj. Op. 220 (emphasis added). But this is just another way of saying that legislative history is irrelevant at Chevron Step One. It assumes that legislative history cannot disambiguate the meaning of the text itself — an assumption that runs contrary to precedent. See supra pp. 230-31; see also, e.g., Cohen v. United States, 650 F.3d 717, 730 (D.C.Cir.2011) (en banc) (consulting “single paragraph” of “surprisingly straightforward” legislative history to determine meaning of “intrinsically ambiguous” text); Elec. Indus. Ass’n Consumer Elecs. Grp. v. FCC, 636 F.2d 689, 696 (D.C.Cir.1980) (finding legislative history that “limited the [agency’s] power”). It also blinks reality. The Congress often uses legislative history, rather than the text, to restrain agencies in the exercise of their delegated authority. See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside — An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L.Rev. 901, 965-78 (2013). Here, for example, the CMS felt completely bound/by the Conference Report in 2001, see Maj. Op. 222-23, and viewed the Conference Report as a substantial hurdle to be overcome in 2008, see 73 Fed.Reg. at 48,715 (“we agree that Congress specifically intended to permit certain per-click leases”). This Court likewise consulted legislative history in Financial Planning Association, 482 F.3d at 488-90 & n. 6 — the case my colleagues cite for their text-only proposition. See Maj. Op. 220.
In sum, the Conference Report demonstrates that the Congress addressed per-click leases with a “level of specificity” that “effectively close[d] any gap the Agency s[ought] to find and fill.” Ethyl Corp., 51 F.3d at 1060. Because subsection (iv) sanctions per-click leases, the per-click ban is not an “other” requirement the CMS can promulgate under subsection (vi). “[AJgencies whose jurisdictional boundaries are defined in the statute [cannot] alter by administrative regulation those very jurisdictional boundaries. To suggest otherwise is to sanction administrative autonomy beyond the control of either Congress or the courts.” Am. Bankers Ass’n, 804 F.2d at 754. The CMS’s ban on per-click equipment leases therefore fails at Chevron Step One. Because my colleagues hold otherwise, I respectfully dissent on this issue.

. Nevertheless, the latter interpretation is plainly the stronger one. The word "charge” means "expense,” "cost,” or the "price required or demanded for service rendered.” Charge, III Oxford English Dictionary 36 (2d ed.1989); see also McGraw-Hill Essential Dictionary of Health Care 159 (1988) ("charge” means the "price assigned to a unit of medical service”). It more naturally refers to the rental rate charged to the lessee, not the rental income earned by the lessor.